THOMAS J. FRANKLIN, Administrator, *vs.* WINONA & ST. PETER RAIL-ROAD COMPANY.

November 8, 1887.

**Master and Servant—Railway Company—Duty to Cover Culverts.—**
It is the duty of a railway company to cover culverts on the line of its road in its yards, and within a reasonable distance of switches, wherever it would naturally be anticipated that brakemen, in the proper discharge of their duties, would be apt to go in making couplings.

**Same—Question for Jury.—**Whether, under the facts of this case, it was the duty of the railway company, in the exercise of due care, to cover a certain culvert, *held* to be a question of fact for the jury.

**Same—Joint Negligence of Master and Fellow-Servant.—**If the negligence of a master combines with negligence of a fellow-servant, and the two contribute to the injury of another servant, the master is liable.

Appeal by defendant from an order of the district court for Dodge county, *Buckham,* J., presiding, refusing a new trial, after a verdict of $1,500 for plaintiff.

*Gordon E. Cole,* for appellant.

*Geo. B. Edgerton* and *Kellogg & Eaton,* for respondent.

MITCHELL, J.   The negligence charged against the defendant was leaving open and uncovered the spaces between the ties over a culvert, into which deceased, a brakeman on defendant's road, fell while making a coupling, and received injuries of which he died.   The errors assigned and urged upon the argument may all be summed up in one, viz., that the evidence does not sustain the verdict, for the reasons (1) that no negligence on part of defendant was proved; (2) that it appears that the negligence of the deceased contributed to the injury complained of; but, if not, (3) that it was caused by the negligence of his fellow-servants who were engaged with him in operating the train.

The whole case, in our opinion, turns upon the first of these three propositions, which is the only one about which we have had any doubt.   It appears from the evidence that from the station of St.

Charles eastward, on defendant's road, there is a steep up grade over which it is often difficult or impossible to draw heavy freight trains without dividing them, or what is called "doubling up." From the top of this up grade there is, going east, a sharp down grade of about 60 feet to the mile for a considerable distance. To get freight trains going east from St. Charles over this up grade by this "doubling-up" process, a spur siding was put in, the easterly end of which connected with the main track a short distance east of the top of the hill. This point of junction was, of course, on the down grade of the main track already referred to. The manner in which this "doubling up" had been uniformly done was to divide the train at St. Charles, and take the front part up over the hill and back it on to the spur siding, leave it there, and return with the engine to St. Charles, and bring up the rear part of the train over the hill until within a short distance of the east end of the spur, and leave it standing there in charge of the rear brakeman, while the engine would cut loose, run ahead and back in on the spur, and bring out the front part of the train upon the main track, when the rear part would be let down to it, and the coupling made by the head brakeman, who leaves his station and descends to the ground for that purpose. The evidence also shows that when in these operations the front part of the train is pulled out from the spur on to the main track, it "usually" runs down, before coming to a stop, so that the hind end of it would be from two to six car-lengths (a car-length is about 32 feet) from the east end of the spur, and is liable sometimes to go still further, depending on the condition of the rails and brakes, as the brakes may not hold the cars well, and they may get a "big start" on this down grade. There is no direct evidence tending to show whether or not it is necessary or good management to let the front part of the train down so far from the switch before bringing it to a stop. The evidence also tends to show that when the rear part is let down upon the front part, it usually shoves the latter forward "one or more car-lengths." It also appears that it is not infrequent for the brakeman to fail to make the coupling on the first attempt, in which case it is necessary for the engineer to "slack ahead," and for the rear brakeman again to let down the rear part of the train, when the head brakeman would again attempt to make

the coupling. The evidence shows that this mode of making a coupling is hazardous, and that it would be much safer to make it by backing the front part of the train to the rear part; but that with heavy trains it was often difficult and even impossible to back up so steep a grade, and that the couplings had always been made at this place in the way first described, and that the company had never issued any rules upon the subject.

About 305 feet east of the east end of the spur track was the uncovered or open culvert already referred to. Two of the freight conductors of defendant testified that there is no occasion or necessity for getting down as far as the culvert in coupling the train after doubling the hill. This is not contradicted by any direct or positive evidence, but the witnesses gave no reason for their opinion, except the fact that they had doubled the hill a great many times, and never got down as far as the culvert, except on one occasion, when both brakemen got off the train without the knowledge of the conductor, and it "got away from them."

On the occasion when the deceased was killed, he was employed as head brakeman upon a freight train which was being doubled over this hill in the manner already described. The rear part had been left standing on the main track with its front end within 60 feet of the west end of the spur, and then the front part brought out from the spur on to the main track, and stopped with the rear end about two car-lengths below the switch, when the rear part of the train was let down slowly to it, the deceased being on the ground for the purpose of making the coupling. The front part of the train was held merely by the steam in the engine, and there is no direct evidence as to whether this was or was not proper railroading. When the two parts of the train came together, the deceased attempted to make the coupling, but failed. The shock brought the hind end of the front part of the train within about two or three car-lengths of the culvert. The deceased then signalled the engineer to slack ahead, which was done; and when the rear part was again let down, he stepped up and made the coupling, and while doing so took a step or two forward, and fell into the open culvert, was run over by the cars, and received the injuries of which he died.

The question is whether reasonable care and prudence required the defendant to cover this culvert. In determining the question we must assume as true every fact favorable to the plaintiff which the jury might fairly have found from the evidence; and if from these facts different minds might reasonably draw different conclusions as to defendant's negligence, that question would be one for the jury, and this court would not say that their verdict was not sustained by the evidence.

The general rule governing the duty of the defendant in the premises cannot perhaps be better stated than by adopting the language of one of the witnesses, viz.: "To cover bridges and culverts on the line of their road within the yards and within a reasonable distance of switches, wherever brakemen would be apt to go in switching and coupling cars." This is custom as well as duty, for the reason that an uncovered culvert would be a sure death-trap to brakemen while engaged in such work. By reason of some unforeseen accident or extraordinary occurrence a coupling might in some instances have to be made at any place on the line of the road far distant from any yard or switch. But the company is not bound to anticipate any such unusual occurrence. Neither is it bound to take steps to guard its employes against the consequences of their own negligence. But wherever in the proper performance of their duties it would naturally and reasonably be anticipated that they would be apt to have to make these couplings, it is the duty of the company to cover their culverts and bridges.

The defendant contends that this mode of making couplings by letting the rear part of a train down upon the front part is dangerous, improper, and negligent, and that they should have been made by backing the front part up to the rear portion, and that the company were not bound to anticipate that the train-men would adopt so dangerous and negligent a practice. It is true that the evidence does show that this mode of making a coupling is attended with great danger, and that this particular train, not being a very heavy one, could have been coupled in the method suggested. But inasmuch as in case of many trains this could not be done, the defendant, by placing this spur at this place for the purpose stated, must be deemed to have

not only authorized, but impliedly ordered, couplings to be made in the way universally practised, and therefore bound to adopt proper safeguards for its employes with reference to such practice. If we were to indulge in surmises outside the evidence, we might conjecture that it might be bad railroading on the part of train-men to permit the front part of a train, when brought out from the spur, to run six or more car-lengths from the switch before bringing it to a stop, or to leave it without brakes, to be held merely by the steam in the engine, so that the concussion with the rear portion of the train would shove it several car-lengths farther forward. But the evidence is that this usually occurred, and there is at least no direct or positive evidence that this was the result of bad management.

Taking into consideration these facts, and keeping also in mind the total distance from the switch to the culvert, that this was a steep down grade, and that in handling freight trains, which are, as compared with passenger trains, heavy and somewhat unwieldy, being controlled by hand-brakes, train-men cannot be expected to calculate distances very accurately in moving them; and the further fact that frequently a brakeman would fail to make the coupling on the first attempt, when a second one would have to be made still further down, —we think that the evidence in this case presented such a variety of somewhat peculiar circumstances that the jury might fairly find that it should have been reasonably anticipated that couplings would be liable to be made as far down as this culvert, and therefore that the railway company, in the exercise of ordinary care to protect its brakemen from danger, should have covered it. This view of the evidence is strengthened by the demonstrated fact that in this case the coupling was made at or near the culvert without the intervention of any unusual or extraordinary cause. We are therefore of opinion that the question of defendant's negligence was a question for the jury, and that we cannot say that their verdict is not supported by the evidence.

The defendant, however, contends that the evidence conclusively shows that deceased's own negligence contributed to the injury. Aside from the mode of making the coupling, (which we have already disposed of,) this contention is based solely upon the hypothesis that

deceased either knew, or in the exercise of ordinary care ought to have known, of the existence and location of the culvert. There is ample evidence to show that he did not in fact know of it, and whether he ought to have known of it was, under the evidence, a question for the jury. He had been on the road only about a month. Unless something special had occurred to call his attention to it, he would not necessarily have occasion or opportunity to observe the culvert while merely passing over the road on his train. The evidence shows that sometimes a conductor would not have occasion for a month at a time to double up his train over this grade. There is no evidence that the train on which deceased was, was ever doubled up there, except what is implied in the somewhat vague and indefinite testimony of the conductor Aldrich. And even if it had, deceased's attention might not have been called to the culvert, unless he had occasion to go down to it in making a coupling. The fact that he did not observe it or look out for it, on the occasion on which he was killed, when his attention was necessarily intently occupied in making the coupling, was certainly no conclusive evidence of negligence.

The further contention is made that even if deceased was not chargeable with negligence, yet it conclusively appears that the conductor and engineer of the train well knew of the location of the culvert, and therefore their attempt to have the coupling made at that place was gross negligence, and this being the negligence of the fellow-servants of deceased, defendant is not liable. A sufficient answer to this is that, conceding that the negligence of the other train-men in this respect contributed to the injury, yet if the defendant was negligent in not covering this culvert, (of which fact the verdict is conclusive,) and this negligence proximately contributed to the injury, the defendant is liable. It is well settled that if the negligence of the master combines with the negligence of a fellow-servant, and the two contribute to the injury of another servant, himself free from negligence, the master is liable. *Cayzer* v. *Taylor*, 10 Gray, 274, (69 Am. Dec. 317;) *Booth* v. *Boston & Albany R. Co.*, 73 N. Y. 38; *Paulmier* v. *Erie R. Co.*, 34 N. J. Law, 151; *Crutchfield* v. *Richmond, etc., R. Co.*, 76 N. C. 320.

Order affirmed.