CHICAGO, B. & Q. R. CO. v. J. A. BARNARD, ADMINISTRATOR.

[FILED JUNE 30, 1891.]

1. **Railroads:** DEATH OF EMPLOYE: ALLEGED NEGLIGENCE. *Held,* That the evidence does not tend to show that the death of the plaintiff's intestate was caused by the negligence of the defendant.

2. **Trial:** DIRECTING VERDICT.  When, in a case tried to a jury there is no conflict in the evidence, and no inferences about which reasonable men might differ, to be drawn from the facts and circumstances proved, the court may direct the verdict which shall be returned.

ERROR to the district court for Gage county.  Tried below before BROADY, J.

*T. M. Marquett,* and *J. W. Deweese,* for plaintiff in error, cited: *Hewitt v. R. Co.,* 31 Am. & Eng. R. Cases, 254; *Morrison v. P. & C. Construction Co.,* 44 Wis., 405; *Sorenson v. P. & P. Co.,* 14 N. W. Rep. [Wis.], 448; *Schultz v. R. Co.,* 28 Am. & Eng. R. Cases, 407; *Easton v. R. Co.,* 39 Fed. Rep. [Tex.], 65; *Skinner v. R. Co.,* 39 Fed. Rep.,

[Ill.], 190; *Illick v. R. Co.*, 35 N. W. Rep. [Mich.], 710; *Koontz v. R. Co.*, 18 Am. & Eng. R. Cases, 86; *C. R. Co. v. Clark*, 15 Id., 263; *U. P. R. Co. v. Beatty*, 10 Pac. Rep. [Kan.], 847. As to the instructions: 1 Greenleaf Ev., 44, 48; *Smith v. R. Co.*, 37 Mo., 292; *Boland v. R. Co.*, 36 Id., 491; *Clark v. R. Co.*, Id., 216; *Parks v. Ross*, 11 How. [U. S.], 373; *Reed v. Deerfield*, 8 Allen [Mass.], 524; *Philips v. Dickerson*, 85 Ill., 15; *A. & N. R. Co. v. Loree*, 4 Neb., 450; *Reynolds v. R. Co.*, 11 Id., 186; *B. & M. R. Co. v. Wendt*, 12 Id., 80; *Manzy v. Hardy*, 13 Id., 36; *Osborne v. Kline*, 18 Id., 351; *Flemming v. R. Co.*, 49 Cal., 257; *Barton v. R. Co.*, 52 Mo., 253; *Bell v. R. Co.*, 72 Id., 58; *Randall v. R. Co.*, 109 U. S., 482; *Simmons v. R. Co.*, 110 Ill., 346; *Holman v. R. Co.*, 62 Mo., 562; *Henry v. R. Co.*, 76 Id., 294.

*George B. Everitt*, and *H. J. Dobbs, contra*, cited: *Johnson v. H. R. R. Co.*, 20 N. Y., 65; *Greenleaf v. R. Co.*, 29 Ia., 14; Shearman & Redfield, Neg., sec. 30; *Kearney, Admr., v. C., M. & St. P. R. Co.*, 47 Wis., 152; *Leonard v. Collins*, 70 N. Y., 90; *Pantzar v. Iron Mfg. Co.*, 99 Id., 368; *Snow v. R. Co.*, 8 Allen [Mass.], 446; Wood, Master and Servant, 688; *Strahlendorf v. Rosenthal*, 30 Wis., 674; Black's Accident Cases, 15, and note; *Koontz v. R. Co.*, 18 Am. & Eng. R. Cases, 85; *Fredenburg v. R. Co.*, 21 N. E. Rep. [N. Y.], 1049; *Plank v. R. Co.*, 60 N. Y., 607; *Franklin v. W. & St. P. R. Co.*, 37 Minn., 409; *Little Rock R. Co. v. Leverett*, 48 Ark., 333; *Johnson v. M. P. R. Co.*, 18 Neb., 699; 2 Thompson, Neg., 1227, 1236, 1239, p. 1083, notes 1, 2, 3, 10, and 12; 2 Thompson, Trials, 1208, 1211, 1668, 1678, and cases cited; *A. & N. R. Co. v. Bailey*, 11 Neb., 332; *Huff v. Ames*, 16 Id., 141; *Lincoln v. Walker*, 18 Id., 275; *Johnson v. M. P. R. Co.*, Id., 698; *O. N. & B. H. R. Co. v. O'Donnell*, 22 Id., 480; *R. Co. v. Stout*, 17 Wall. [U. S.], 657, 664; *Rudolphy v. Fuchs*, 44 How. Pr. [N. Y.], 155, 160; *Houfe v. Fulton*, 29

Wis., 296; *McLain v. Van Zandt,* 7 Jones & Sp. [N. Y.], 347; *D. & M. R. Co. v. Van Steinburg,* 17 Mich., 100; *Thurber v. R. Co.,* 60 N. Y., 326; *Dolfinger v. Fishback,* 12 Bush [Ky.], 475; *Briggs v. Taylor,* 28 Vt., 183; *Kane. v. Learned,* 117 Mass., 190, 194, and 'cases; *Simmons v. R. Co.,* 110 Ill., 340; *Lake Shore, etc., R. Co. v. O' Conner,* 115 Id., 255; *Moore v. Murdock,* 26 Col., 514; *Bartelott v. Bank,* 119 Ill., 259, 272, and cases; 2 Thompson, Trials, 1213, sec. 1668 and cases, 1678 and cases; *Smith v. R. Co.,* 15 Neb., 583; *I. R. & Ft. S. R. Co. v. Perry,* 37 Ark., 164; *State v. Boles,* 18 S. Car., 534; *Way v. R. Co.,* 35 Ia., 585; *C., etc., R. Co. v. Sykes,* 96 Ill., 162, 176; *Dick v. R. Co.,* 38 O. St., 389; Hilliard's New Trials, pp. 26, 448, 549; *Smith v. Peninsular Car Co.,* 60 Mich., 501; *Buesching v. St. L. Gas Light Co.,* 73 Mo., 219; *Wabash, etc., R. Co. v. Locke,* 112 Ind., 404; *Lewis v. Seifert,* 116 Pa. St., 628; *Wuotilla v. Duluth Lumber Co.,* 37 Minn., 153; *Whalen v. R. Co.,* 16 Ill. App., 323; *Ferren v. R. Co.,* 9 N. E. Rep. [Mass.], 608, and cases.

NORVAL, J.

This is an action for damages by reason of the death of James Persinger, the defendant in error's intestate, caused by the alleged negligence of the railroad company. At the close of the trial the jury returned a verdict in favor of the plaintiff, and assessed the damages at the sum of $5,000. From the judgment entered upon the verdict the defendant brings the case to this court by proceedings in error.

The principal question we are called to pass upon is, whether there was any testimony in the case tending to sustain the verdict and judgment. It appears from the record that on the night of December 9, 1888, James Persinger left Lincoln on his first trip as a brakeman on the plaintiff in error's stock train, running between that place and Omaha. The train was pulled by two engines, and arrived at the station house near South Omaha on the

morning of December 10, about 6 o'clock. At this place there is a side track which was used for setting out cars, and for running cars to the South Omaha stock yards. East of the station house, 385 feet, is a bridge built over the Belt Line railroad. This bridge is 422 feet long, eighteen feet above the ground at one end and thirty feet at the other, and is a part of the company's main line. The bridge was not floored between the tracks and had no railings or protection of any kind for a person standing or walking thereon. Persinger was the head brakeman, whose place was upon top of the cars near the front of the train, to give signals to the engineer and help set the brakes. J. W. Moore was the rear brakeman, whose duty it was, after uncoupling the way car and the other cars that were not to go to the stock yards, to throw the switch so that the balance of the train could be backed in on the side track. Just before the rear of the train reached the station house the caboose and the two rear cars were cut off by Moore from the balance of the train and left on the main track. The front portion of the train was stopped on the bridge. Moore gave the signal to Persinger, who was then on top of the cars, to pull ahead so as to clear the switch, and on Persinger repeating the signal to the engineers the engines started. Moore discovered that the rear part of the train did not move, so he walked along the side of the cars to the bridge, where he climbed on top of one of the cars, and on walking forward he found that the train was broken in two. Persinger was standing on the third car from the break when Moore walked up to him and said "We are broken in two." Persinger replied "I guess not," and signaled the engineers to go ahead. They both walked forward to the break in the train, which was over the bridge. Moore climbed down onto the bridge, when he discovered that the coupling pin was broken. He left Persinger standing on the car and went to the engine to get another pin. When he reached the engine, Taylor,

one of the engineers, inquired of him where Persinger was; he replied that he left him on the cars; and Taylor said, "I am afraid he is down over the bridge." Moore, on returning to the car where he left Persinger, discovered his body on the ground. He and the fireman went down to where Persinger was lying and found that he was dead. The body was lying partly under the outer line of the bridge, and the lantern he carried was found two or three feet from his body.

H. G. Taylor and L. S. Collier, the engineers, were the only witnesses who testified on the trial as to the manner of the accident. They were called to the witness stand by the defendant in error. Mr. Taylor testified on this branch of the case as follows:

Q. Did you see the lantern go down?

A. I did.

Q. Were you the first one to see it?

A. I cannot say.

Q. What did you see when you saw the lantern go down?

A. I stood on my engine—I stood and thought there was something wrong; I saw the rear brakeman had come over the top of the cars and come where the deceased was standing on the cars of the main body of the train; Brakeman Moore came along and he came down by the side of the cars, standing on the main body of the train, and got down on the main body of the bridge and went— that would be about half a car's length away from the train —towards the engine to get a pin to couple up the train with. When the rear brakeman was about half a car's length from the end I saw the lamp as it whirled, making a half circle, going over there on the side; I went and saw the rear brakeman and asked him where he left him, and he said he left him on top of the cars, and I said I am afraid he is down over the bridge; well, says Moore, if he has gone over the bridge he will brake no more.

Q. Then what did you do?

A. Then Moore, the brakeman, went back to the point to ascertain where the deceased was at that time, and found out where he was, and my fireman followed Moore when he went back. There were no words from the brakeman, nor was Persinger to be seen. Then they came running back over the trestle work and went below the bridge, and there they found him lying.

Q. Did you get down; did you go with them?

A. No, I waited until after they were down; I was the last down.

Q. State from that profile, Exhibit "A," where you found the body of Persinger.

A. About this place here.

C. Between the seventh and eighth spans from the west end of the bridge, counting the small spans at the end of the bridge?

A. Yes.

Q. Now state where the body was lying with reference to the stringers on the south side of the bridge?

A. It was lying with its feet towards the south and his head rather inclined in towards a plumb line from the top of the stringers.

Q. That is, he was lying partly under the outer line of the track?

A. Yes.

Q. The stringers being the outer line of the track?

A. Yes.

Q. Where was the lantern?

A. About an arm's length from where he was lying, south of him.

Q. Was it broken?

A. It was setting on end; whether broken I could not say.

Q. You didn't notice whether the glass was broken out?

A. No, sir.

Q. Was there a stone there so you could identify the place?

A. Yes.

Q. What kind of a stone was it?

A. A common flagstone.

Q. A common rough stone?

A. Yes.

Q. Do you know how high the bridge was where Persinger went down?

A. I would say from twenty-five to thirty feet, or thereabouts.

Q. When you first saw him he was going over on top of the car?

A. Yes.

Q. How far up was he on the car?

A. I could not say, only from the reflection against the side of the car as it was going down.

Q. The lamp dropped straight down?

A. No, it was rather outward.

Q. Did it fall straight down?

A. No, it was going in a circle.

Q. How far did it circle out from the side of the car?

A. I don't know exactly; it was about the same as a man would take his arm and give a swing; about like that.

Q. When you first saw it was the reflection near the top or bottom of the car?

A. It was near the top of the car.

Q. You don't know exactly how near the top of the car?

A. No, I cannot tell.

Q. Who gave you the signal to stop?

A. Persinger.

Q. He was on top of the train?

A. Yes.

Q. You stopped in response to his signal?

A. Yes.

Q. What else did he do?

A. He stood until the rear brakeman came up.

Q. Then what did he do?

A. He was standing still on the train.

Q. How did you know that?

A. I saw him.

Q. Could you see Persinger from there?

A. Undoubtedly so.

Q. Plainly?

A. It was not very dark, and he had his lantern there.

Q. Don't you know it was a dark night?

A. I don't think it was very dark.

Q. There was no moon?

A. I don't know there was no moon, but a sort of reflection in the sky.

The testimony of Collier, the other engineer, is to the same effect.

In the petition and in the brief of counsel for defendant in error, the defendant company's liability for the death of Persinger is placed upon the ground that the defendant was guilty of negligence in not flooring the bridge and erecting railings on the sides, and in having failed to warn the deceased before he started on the trip of the condition of the bridge, he being wholly unacquainted with it. It appears from the evidence that Persinger was carrying his lantern at the time the accident happened, and could plainly see the bridge. The company had a right to expect that he would use reasonable care and would know what was easily to be seen by his own observation, that the bridge had no floor nor railings, and the danger attending the climbing down a ladder on the side of a car at that place. The duties of his employment did not require him to climb down onto the bridge, nor was he requested so to do by any one, and if he made the attempt it was at his own peril.

The bridge was constructed in the usual manner for the passage of trains, and was not intended to be, nor was it

ever used by brakemen in coupling and uncoupling cars.
While it was usual for the engines of freight trains to pull
onto the bridge, in order to set out cars onto the stock
yards track, no coupling or. uncoupling of cars was re-
quired to be done on the bridge. That work was always
performed by the brakeman on the ground west of the
bridge. Had the train not broken in two there would
have been no necessity for a brakeman going onto the
bridge. It could not be anticipated that the coupling
would break when it did, so as to require an employe to
leave the train and walk over the bridge. The defendant
was not required to have it planked and barriers erected,
in order to guard against every possible accident. It is
only responsible when it fails to exercise ordinary care to
prevent accidents which are liable to occur. The defendant
must have failed to perform some obligation it owed the
deceased, before there can be a recovery. The rule which
we recognize is applied and illustrated in *Illick v. Flint &
P. M. R. Co.*, 35 N. W. Rep. [Mich.], 708; *Koontz v.
C., R. I. & P. R. Co.*, 65 Iowa, 224; *Morrison v. Phillips
& Colby Construction Company*, 44 Wis., 405; *Schultz v.
C. & N. W. R. Co.*, 28 Am. & Eng. R. R. Cases, 407.

The case of *Koontz v. C., R. I. & P. R. Co., supra,* is quite
similar in its facts to the one before us. Mr. Justice Sei-
bers in the opinion says: "The bridge in question was
sufficient for trains to pass over it with safety. For this
purpose due care did not require the bridge should be
planked. If, however, it was necessary for employes to
pass over the bridge in the performance of their duties,
ordinary care would seem to require that barriers should
be erected or other precautions against accident used; the
rule being, as we understand, when employes are required
to use appliances in the performance of their duties that
such appliances should be kept in suitable repair, and be
reasonably sufficient for the purpose intended. Several
authorities are cited in support of this proposition, and we

do not understand the rule to be controverted by counsel
for the defendant.   Their contention is that it could not
be anticipated something would occur which would render
it necessary to stop the train at the place it did, and that it
would be necessary for an employe to pass along the track
and over the bridge, for the purpose of ascertaining what
was the matter; and we think this is so.   If this is not
true, then every bridge must be planked or otherwise
guarded and barriers must be erected at every cattle-guard;
for it is impossible to tell where it may become necessary
or prudent for a train to be stopped and an employe re-
quired, in the performance of his duty, to pass alongside
of the train for some necessary purpose.   There is no evi-
dence tending to show that this bridge is an exception to
those constructed at other places on the line of the road.
Ordinarily it is not expected that employes will be required
to walk across bridges, and they are not ordinarily con-
structed so that this can be done with entire safety, at least
during the night time.   Ordinary care does not require
that every possible contingency must be anticipated and
guarded against, but only such as are likely to occur.   That
a railroad company should anticipate that a train may, for
some necessary purpose, be stopped at a place other than
the usual stopping places is possibly true, but at what place
cannot be anticipated, and therefore they, in the exercise of
ordinary diligence, are not required, as we have said, to
plank every bridge or cattle-guard and have the whole
track so guarded as to prevent accident to employes.   The
hazardous nature of the business is such that accidents oc-
cur for which the company is not responsible, and this is
one of them."

We have carefully examined and considered the author-
ities cited in the brief of counsel for the defendant in error.
Of the cases brought to our attention, *Franklin v. Winona
& St. P. R. R. Co.*, 37 Minn., 409, is claimed by his coun-
sel to be the most analogous to the one at bar.   In that

case, a brakeman on defendant's road, while making a coupling near a switch, fell into an open culvert and received injuries of which he died. The court, in speaking of the duty of a railway company to cover culverts and bridges on the line of its road, say : "The general rule governing the duty of the defendant in the premises cannot perhaps be better stated than by adopting the language of one of the witnesses, viz; 'to cover bridges and culverts on the line of their road within their yards and within a reasonable distance of switches, wherever brakemen would be apt to go in switching and coupling cars.' This is custom as well as duty, for the reason that an uncovered culvert would be a sure death-trap to brakemen while engaged in such work. By reason of some unforeseen accident or extraordinary occurrence a coupling might in some instances have to be made any place on the line of the road, far distant from any yard or switch. But the company is not bound to anticipate any such unusual occurrence; neither is it bound to take steps to guard its employes against the consequences of their own negligence. But whenever in the proper performance of their duties it would naturally and reasonably be anticipated that they would be apt to have to make these couplings, it is the duty of the company to cover their culverts and bridges."

We see nothing in the Minnesota case that conflicts with the views we have expressed in this opinion.

We have thus far, in the consideration of this case, assumed that Persinger climbed down the ladder on the side of the car, and on account of the bridge not having a floor and railings, he fell and lost his life. There is no conflict in the testimony bearing upon the question as to how the accident occurred; nor is there a single fact or circumstance disclosed by the evidence which tends to show that the deceased attempted to climb down off of the car onto the bridge. No such inference can be properly drawn from the evidence. While on the other hand the testimony of

the engineers—which is all the evidence given on that branch of the case—tends to show that he fell from the car. What caused him to fall no one knows.    That part of the train on which he was standing was not moving, nor was an engine attached to it.    It is plain to us that Persinger's death was the result of an unaccountable accident, for which no person was to blame.   It was one of the perils usually incident to that kind of employment which the deceased assumed, and for which the law affords no remedy.

The defendant asked the court to direct a verdict against the plaintiff, which request was denied.    In this we think there was error.    Whereéver, in a case tried to a jury, there is no conflict in the testimony, and no inferences about which reasonable men might differ, to be drawn from the facts and circumstances proved, the court may direct the verdict which shall be returned. (*A. & N. R. R. Co. v. Loree*, 4 Neb., 446; *Reynolds v. B. & M. R. R. Co.*, 11 Id., 186; *Lent v. B. & M. R. R. Co.*, Id., 201; *B. & M. R. R. Co. v. Wendt*, 12 Id., 80; *Manzy v. Harvey*, 13 Id., 36; *Hiatt v. Brooks*, 17 Id., 38; *Osborne & Co. v. Kline*, 18 Id., 344.)

For the reasons stated the judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.