## MILLER v. DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

RAILROADS—INJURY TO EMPLOYÉ—SIDE TRACKS—OPEN DRAIN—ASSUMPTION OF RISK.

A brakeman, while running backward on a side track, adjusting the coupling on a car, was tripped by stepping into an open drain under a switch, run over, and killed. The drain had been there for years, and the brakeman had been in the employ of the railroad for more than a year, as a member of a switching crew which daily stopped at the siding for dinner, and put in or took out cars there four or five times a day. No complaint had ever been made by him as to the condition of the drain. *Held*, that he had assumed the risk.

Error to Wayne; Brooke, J. Submitted October 10, 1902. (Docket No. 42.) Decided June 30, 1903.

Case by Christine Miller, administratrix of the estate of John Miller, deceased, against the Detroit, Grand Haven & Milwaukee Railway Company, for negligently causing the death of plaintiff's intestate. From a judgment for

defendant on verdict directed by the court, plaintiff brings error.    Affirmed.

Plaintiff's decedent was a brakeman in the employ of the defendant.    The accident by which he met his death occurred in the defendant's yard near Ferry avenue, in the city of Detroit.    At this place were two main tracks and a siding known as " Wilson Siding."    About 200 feet north of Ferry avenue are two switches.    Underneath these switches was a drain about ten inches deep and eight inches wide.    This drain led into an open ditch by the side of the roadbed, which was from two to three feet deep.    The drain was necessary in order to keep the water away from the switches and permit their free and proper use.    The ground was covered with snow to the depth of six or eight inches.    While the deceased was running backwards, in the manner hereinafter stated, he fell, was run over by the car, and killed.    The negligence alleged is the maintenance of this open ditch and permitting it to be covered with snow; the claim being that the deceased stepped into this ditch and fell.

Decedent was a man of 18 years' experience in railroading.    He had worked as a member of this switching crew for a year or so previous to the accident.    As such his work extended over all the yards in Detroit.    This open drain had existed for years, and had been cleaned out and deepened two inches in the month of November previous to the accident.    The crew generally tied up at the Wilson siding for dinner.    They went there every day, and sometimes four and five times a day, to put in or take out cars.    On the morning of the accident the conductor informed the crew that he wanted to get a car off this Wilson siding.    The train was left south of Ferry avenue, and the crew ran up with the engine over the switch, and came down on the Wilson siding, and coupled onto 13 cars.    One of these was then thrown out on the main track, and the engine, with the other 12 cars, pushed back onto the siding.    After the thirteenth car was thrown out onto the

main track, McGar, the other brakeman, gave Miller the signal for a lost link; *i. e.*, that it was necessary to get a link somewhere to make the coupling with the cars which they were going in on the Wilson siding to get. On receiving the signal, Miller went to the north end of the car that had been shoved out onto the main track, took the link out of that car, and then started northerly to meet the cars which were being shoved south in on the Wilson siding, walking about 200 feet before meeting them. The engine was north of the 12 cars, headed towards the city, pushing the cars in towards the cars standing on the Wilson siding, which were 400 to 500 feet distant. When he met the backing cars, he went in front of the first car, and ran backwards with it, fixing the coupling, for about 50 feet, when he slipped and fell, the car passing over him, and killing him instantly. He might have walked back between the main track and the side track, or he might have ridden back,—there being a step on the side of the backing car on which he could have stood,—to the place where the cars which were to be coupled onto stood. In either case he could have stopped the backing train by signaling McGar if he had walked back, or by himself signaling the engineer if he had ridden back; the engineer being subject to the signal of either. Either way would have been safe. Instead of adopting either of these ways, he walked north 200 feet, and then ran backwards in front of a car moving 5 to 6 miles an hour, in an attempt to fix the coupling. If he had not been injured, he would have had to walk or ride back 400 to 500 feet to get to the car to be coupled onto.

The rule of the company prohibited doing the work in the manner it was done by the deceased; but it is urged by the plaintiff that the custom of the employés to do the work in this manner was known to the company, and that such custom had abrogated the rule. The court, when the plaintiff had rested her case, directed a verdict for the defendant. In directing a verdict the circuit judge said:

"I do not think that any kind of testimony on behalf

of the railroad employés as to the breach of rule 24 in going between moving cars for the purpose of coupling or uncoupling would come within this case. The cars to be coupled were, at the time that he went in front of this car, at least 500 feet apart. The coupling could be made 400 feet south of where he was when he started north. There was absolutely no necessity for him to go towards that moving train. Nobody had ordered him to do it. He simply took that course entirely voluntarily and on his own motion. He could have gone south, and at a brisk walk could have been where the two cars would have come together, the 12 cars in motion being then 250 feet north of him. After he had got to the track he could have started south, or he could have remained standing where he was, and boarded the car as it passed him, and waited until the cars had slowed up nearing the other train. It is undoubted that brakemen will, as two cars come together, frequently step between; but it does not appear to me that any amount of testimony that it was a common practice for brakemen to go in front of cars moving 5 or 6 miles an hour, when the coupling to be made is 500 feet away, and go backwards or run sideways in front of a moving train of 13 cars, can be anything but contributory negligence under any circumstances. I do not care about the negligent construction of the track, because it seems to me he had no business to attempt such a risk."

*Lehmann & Riggs* and *Brennan, Donnelly & Van De Mark*, for appellant.

*E. W. Meddaugh* (*Geer & Williams*, of counsel), for appellee.

GRANT, J. (*after stating the facts*). Did the deceased assume the risk of the open drain? A drain or depression under switches is absolutely necessary. This is recognized in *Jarvis* v. *Railroad Co.*, 128 Mich. 61 (87 N. W. 136), and also *Franklin* v. *Railroad Co.*, 37 Minn. 409 (34 N. W. 898, 5 Am. St. Rep. 856). Its depth must depend upon circumstances. No complaint is made that the drain in this instance was deeper or wider than necessity required. Even on a main line, where the employé has full knowledge of the unsafe condition of the

roadbed, it is held that he should refuse to work until the roadbed is made safe, and that, failing to do so, he is responsible for the consequences. *Little Rock, etc., R. Co.* v. *Leverett,* 48 Ark. 333 (3 S. W. 50, 3 Am. St. Rep. 230). A railroad company is not required to keep its side tracks absolutely even and smooth between the ties. They may be used without ballast, and the company will not be liable to an employé who falls in consequence thereof, if he was familiar with the condition, and made no objection. *Batterson* v. *Railway Co.,* 53 Mich. 125 (18 N. W. 584); *Ragon* v. *Railway Co.,* 97 Mich. 265 (56 N. W. 612, 37 Am. St. Rep. 336). In *Batterson* v. *Railway Co.* it is said:

"It is matter of everyday experience that similar openings for ditches or other depressions are very common, and that it would not always be proper to close them."

This ditch or drain was known to exist by those living near by, who had nothing to do with the railroad. A hotel keeper living in the vicinity testified that the ditch had been there for years. The deceased passed over it every day. The crew to which he belonged stopped at this siding for dinner every day, and put in or took out cars four or five times a day. He had been in the employ of the company, at this place, for about a year. He must, therefore, have had knowledge of it, and voluntarily worked there without objection. If he considered it unsafe, he should have called the attention of his employer to its unsafe condition, and asked to have it covered. If it was unsafe, none knew it better than he and his fellow-servants, and no one ever made complaint during the many years it had existed, and there is no claim that any other accident ever occurred there. It must be held, therefore, that the condition of this side track was one of the risks assumed by deceased.

The case of *De Forest* v. *Jewett,* 88 N. Y. 264, is a case directly in point, and was cited with approval in *Ragon* v. *Railway Co., supra.* In that case there were

small, open ditches running across the track between the ties, which were in existence when the plaintiff entered the employment, and were well known to him. It was held that he assumed the risk.

Counsel for plaintiff rely upon *Plank* v. *Railroad Co.*, 60 N. Y. 607. That case is commented upon in *De Forest* v. *Jewett, supra,* and held not applicable to facts like those here existing. See, also, *Illinois Central R. Co.* v. *Neer*, 26 Ill. App. 356; *Wescott* v. *Railroad Co.*, 153 Mass. 460 (27 N. E. 10); *Michigan Cent. R. Co.* v. *Smithson*, 45 Mich. 212 (7 N. W. 791); *Swoboda* v. *Ward*, 40 Mich. 420; *Phelps* v. *Railway Co.*, 122 Mich. 171 (81 N. W. 101, 84 N. W. 66).

Judgment affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. CARPENTER, J., did not sit.