MICHIGAN CENTRAL R. R. Co. v. JOHN L. SMITHSON.

*Negligence—Injury to employees—Coupling cars.*

An employer cannot be punished in damages for injuries received by employees who have voluntarily assumed the risks of the employment with full knowledge of the methods employed.

Business establishments are not bound at their peril to use only the best machinery and implements and the safest methods.

It is not negligence for a railroad company to use machinery that is a necessity of its business and which all persons in its employment must be presumed to know is a necessity.

A switchman has his hand crushed while coupling a freight car furnished with double deadwoods and received from another road where such a contrivance was generally used. He had not been expressly notified that he would be required to handle such cars, but in the course of commerce and as a matter of business necessity as well as of statu- tory obligation they were being constantly received and forwarded like all other cars adapted to the gauge of the road, and having occasion to run thereon. *Held*, that the switchman could not main- tain a suit against the company as for negligent injury in receiving the cars or in omitting to notify him thereof.

*It seems* that a master need not expressly notify his servant of a risk where the nature of the business and of the risk is such that the only effective notice he can have is from his own general experience and the visible presence of that from which the danger is to be appre- hended.

Error to the Superior Court of Detroit. Submitted November 9, 1880. Decided January 12, 1881.

CASE. Defendant brings error. Reversed.

*Henry Russel* and *G. V. N. Lothrop* for plaintiff in error, cited as in point on the facts: *I. B. & W. R. R. v. Flani- gan* 77 Ill. 365; *Way v. Ill. Cent. R. R.* 40 Ia. 341; *Bald- win v. C. R. I. & P. R. Co.* 50 Ia. 680; *Conway v. Ill. Cent. R. Co.* id. 465; *Ft. W., J. & S. R. R. v. Gildersleeve,* 33 Mich. 133; *Hulett v. St. L. K. & N. Ry. Co.* 67 Mo. 240; *Smith v. St. L., K. & N. R. R.* 69 Mo. 32; *Toledo,*

*Wabash & Western Ry. v. Black* 88 Ill. 113 ; *T. W. & W. Ry. v. Asbury* 84 Ill. 434 ; *Wonder v. B. & O. R. R.* 32 Md. 411 ; *Warner v. Erie Ry* 39 N. Y. 471 ; and as to the employee's assumption of risk : *Cagney v. H. & St. J. R. R.* 69 Mo. 416 ; *Lovejoy v. B. & L. R. R.* 125 Mass. 79 ; *Pennsylvania Co. v. Lynch* 90 Ill. 334 ; *Clark v. C. B. & Q. R. R.* 92 Ill. 44 ; it is not negligence to use dangerous machinery : *Ladd v. New Bedford R. R.* 119 Mass. 412.

*Don M. Dickinson* and *Griffin & Dickinson* for defendant in error.   A party entering upon a particular employment assumes the risks and perils usual thereto, where the machinery used is not defective either in its construction or from want of proper repair, and where the usual and customary means are adopted to guard against accidents ; if wanting in either respect there is an increased risk, and if the servant is injured in consequence thereof, the master must be held responsible therefor : *Swoboda v. Ward* 40 Mich. 423 ; a man cannot be understood as contracting to take upon himself risks which he neither knows nor expects, nor has reason to look for ; and it would be more reasonable to imply a contract on the part of the master not to invite the servant into unknown dangers, than on the part of the servant to run the risk of them : Cooley on Torts 550–6 ; the servant stands towards the master with respect to an injury, outside the usual and ordinary risks of his employment, in the same position as a stranger : *Smith Admr's v. N. Y. & H. R. R. Co.* 19 N. Y. 127 ; *Smith v. N. Y. & H. R. R. Co.* 6 Duer 225 ; a railroad company is bound to see to it that its road is in good condition and safe, and the engines are perfect and properly constructed, according to the present improvement in the art, and if any injury is occasioned to an employee by an imperfection in the road or machinery, the company will be held responsible, provided it had knowledge of the defect : *Nashville & C. R. R. Co. v. Elliott* 1 Cold. (Tenn.) 611 ; it is the duty of those using hazardous agencies to control them carefully, to adopt every known safeguard, and to avail themselves from time to time of every improved invention

to lessen the danger to others; great danger demands higher vigilance and more efficient means to secure safety : *Frankford, etc., Turnpike v. Phil.* 54 Penn. St. 345 ; it is the imperative duty of railway companies to discard all unsafe or dangerous cars and machinery, or such parts thereof as may be dangerous to use, and to adopt and use all improvements in cars and machinery which are calculated to insure the safety of employees and passengers : *St. Louis & S. E. R. R. Co. v. Valirius* 56 Ind. 511; the care which is required of the master extends not merely to furnishing safe machinery of proper construction, but also extends to providing other means, like notices, which an ordinarily prudent and careful man would provide for the safety of employees; Thompson on Negligence 979; where there are special risks in an employment of which the employee is not from the nature of the employment cognizant, or which are not patent in the work, it is the duty of the employer especially to notify him of such risks, and on failure of such notice, if he is hurt by exposure to such risk, he is entitled to recover from the employer in all cases where the employer was either cognizant of or ought to have been cognizant of the risks: Wharton on Negligence § 206; *Malone v. Hawley* 46 Cal. 409; *Wonder v. R. R.* 32 Md. 411; such knowledge will be implied from facts; see *Walsh v. Peet Valve Co.* 110 Mass. 23; *Baxter v. Roberts* 44 Cal. 187; even if an employee is proved to know of the existence of the defect, yet under circumstances of haste in the employment requiring prompt attention, "it cannot be justly inferred that this knowledge was present to him at this particular time :" Wharton on Negligence § 219; *Greenleaf v. R. R.* 29 Iowa 47; *Snow v. Housatonic R. R.* 8 Allen 441; *Patterson v. P. & C. R. R. Co.* 76 Penn. St. 389; the want of proper rules and regulations published to employees, is negligence, also; *Cooper v. Iowa Central* 44 Iowa 134; *Chicago Ry v. Taylor* 69 Ill. 461; *Vose v. Lancashire R. R.* 2 H. & N. 729.

COOLEY, J. Smithson sued the Railroad Company to recover damages for an injury alleged to have been caused by the

company's negligence.   He was a switchman in the employ
of the company, and had been for about a month, when in
an attempt to couple two freight cars his hand was caught
between them and he was seriously hurt.   He had been a
switchman and brakeman for several years on the Grand
Trunk Railway of Canada before entering the service of
defendant.   The cars he was coupling were cars belonging
to, and received from, the New York, Lake Erie & Western
Railway.   At the ends were what are known among railroad
men as double dead-woods.   A car of this construction
has a horizontal timber at the end with projecting blocks
bolted to each end of the timber, and the draw-bar for
coupling extends but little beyond the faces of these blocks.
In coupling, the blocks come together and receive the blow
of the cars.   The coupling-pin is dropped between the blocks
from above.

Distinguished from the car with double dead-woods is that
known as the single dead-wood, which dispenses with the
projecting blocks, and leaves the draw-bar to receive the con-
cussion when the cars are coupled.   The cars of the defend-
ant are single dead-woods, and so perhaps are four-fifths of
all the cars which pass over its road.   Several long lines,
however, use the double dead-woods exclusively, and among
these are the Pennsylvania Railroad Company's lines, those
of the Delaware, Lackawanna & Western, and the Pittsburgh,
Fort Wayne & Chicago.   The New York, Lake Erie &
Western Railroad Company has adopted the double dead-
woods, but have some old cars not of that style.

The gravamen of the plaintiff's complaint is that he was
employed by the defendant in making up trains and coupling
cars; that the existence and use of double dead-woods was
unusual and in the highest degree dangerous to the life and
limb of persons so employed as the defendant well knew, and
that on the 9th day of March, 1879, the plaintiff, in and
about the ordinary course of his said employment, "and
when the plaintiff did use due care, was coupling certain cars,
which said cars by the carelessness, negligence and default of
the defendant, had been introduced and used upon the said

railroad by the defendant, then having and bearing such unusual attachments called dead-woods, so as aforesaid placed and being, which the defendant well knew, but of which the plaintiff was wholly ignorant, without using reasonable and ordinary care to notify its employees or the plaintiff of the existence of such attachments thereon so placed and being, and without providing reasonable and ordinary means and appliances for the protection of its employees, and especially the plaintiff, in coupling the same, was caught between the dead-woods so placed and being upon said cars, and being so held the said cars were driven and run against plaintiff, and a portion of his hand was destroyed," etc.

The coupling of cars on the road of defendant appears to be done with the hand alone, without the assistance of any mechanical implement. There is some evidence that what is called a "stick" is sometimes made use of in coupling the double dead-woods, but the evidence is very slight, and scarcely intelligible, and it does not appear that the use of such an implement is general anywhere. The plaintiff gave evidence that tended to show that the coupling of the double dead-woods belonging to the New York, Lake Erie & Western Railway Company is always dangerous; one witness going so far as to testify that the man attempting it is more apt to be caught than to escape with safety. It was also shown that the construction of these cars differed from double dead-woods in general; the blocks being higher and nearer together; and there was considerable evidence that this difference increased the danger. On the other hand it was shown that the New York, Lake Erie & Western Railway Company deliberately adopted this peculiar form "as the result of some twenty years' experience," and that many of the cars of that company are passing over the road of defendant constantly. Four hundred and seventy-six passed over in the first ten days of plaintiff's service, but how many of these were double dead-woods, or how many it was necessary to couple, did not appear.

The case was submitted to a jury who returned a verdict for the plaintiff, assessing his damages at $5000. It is

claimed in this court that there was nothing to submit to the jury.

Nobody disputes that when a person enters the service of a railroad company he assumes the risks and dangers incident thereto, and cannot demand compensation from his employer for any accidental injury. In *Davis v. Detroit, etc., R. R. Co.* 20 Mich. 105; *Quincy Mining Co. v. Kitts* 42 Mich. 34, and other cases, we have said all that can be needful on the subject, and shall not repeat it here. Nobody disputes either that the employer is charged with the duty of care to those in his service, and must not subject them to risks by his own negligence. This is amply explained in *Chicago, etc., Railway Co. v. Bayfield* 37 Mich. 205; and in *Swoboda v. Ward* 40 Mich. 420, it was held in an opinion by Mr. Justice Marston, that when the servant is to be sent into dangerous places or put to dangerous tasks of the risks of which he is ignorant, due care on the part of the master requires that he shall give the servant notice and put him on his guard. We abide by all these decisions, and new cases must be governed by them as the facts may require.

If the only question before us were whether it was prudent and safe to introduce and use the cars with the coupling arrangement now complained of, we should perhaps be compelled upon the evidence before us to decide that it was not. The preponderance of evidence that they are more dangerous than the single dead-woods is very decided, and makes us regret that we are without explanation as to what it was in the twenty years' experience of the New York, Lake Erie & Western Railroad Company that led the company to adopt this style of car. It is not likely that the consideration of safety escaped attention, because it should have had great if not controlling weight; but it must be admitted that the evidence presented in this record tends to establish the fact that all double dead-woods are more dangerous to the man called upon to couple them than are the single dead-woods, and that the form adopted by the New York, Lake Erie & Western is most dangerous of all. There is nevertheless some evidence the other way.

But if it be conceded the double dead-woods are so dangerous, the concession does not dispose of this case. This is a question of negligence. The charge is that defendant has been guilty of a breach of duty to one of its servants in permitting the cars of the New York, Lake Erie & Western Railroad to come upon his own road, and to be handled and coupled by its switchmen, without warning them of the peculiar construction and without furnishing them with appliances to make the coupling safe. There is no dispute regarding the main facts bearing upon this question. The company owning these cars have many thousands of them in use, and probably several hundred are coupled together every day. No doubt accidents sometimes occur, for the act of coupling cars of any pattern is always hazardous; but the evidence of persons having actual knowledge does not show that they are more frequent on that road than on others. When a witness testifies from mere inspection, as one does, that the chances of injury are greater than the chances of escape, we have a right, and indeed are compelled, to receive his opinion with many allowances, and to suspect that he has either misspoken or used words without fully apprehending their meaning. If this opinion even distantly approached the truth, a single day's destruction of life and limb from the use of these cars would startle the country, and be surely followed by desertion of laborers and quite as surely by prohibitory legislation. Any form of car a railroad company may select for use must be one that with care can be coupled safely, or the company could not afford to operate its road by means of them. With needless exposure of its men to danger by the use of unsuitable cars, the company would inevitably subject itself to public odium and disfavor; casualties to property would be increased, and if it could succeed in manning its road with laborers, it must pay them wages increased by the risks of danger. These are patent facts, and they justify an inference when a particular form of car is deliberately chosen and adhered to, that it is believed by those who make use of it to be as safe as any other. It is no doubt true that a company may make serious mistakes in

such a case.   It is quite possible for a company to adhere unreasonably to something which has been thoroughly demonstrated to be dangerous; and the mere fact that it does so cannot be conclusive in its favor of the want of negligence.   But on the other hand no railroad company, and no manufacturing or business establishment of any kind, is bound at its peril to make use only of the best implements, the best machinery and the safest methods.   The State does not require it, and could not require it, without keeping such minute and constant supervision of private affairs, and interfering with such frequency as under all circumstances would be irritating and damaging, and in many cases would become intolerable.   In the main the State must leave every man to manage his own business in his own way.   If his way is not the best, but nevertheless others, with a full knowledge of what his way is, see fit to co-operate with him in it, the State cannot interfere to prevent, nor punish him in damages when the risks his servants voluntarily assume are followed by injuries. *Hulett v. St. Louis, etc., R. R. Co.* 67 Mo. 240; *Lovejoy v. Boston, etc., R. R. Co.* 125 Mass. 79.

But it is said that even if it be not negligence in another company to use these cars, it is negligence in defendant to receive them among other cars, and to send its switchmen to make up trains with them without giving them notice of the difference.   The desirability of notice is manifest, but how it is to be given is not so plain.   It appears that the company inspects every car offered to it by another for transportation, and marks for rejection all that are considered unsafe, and sets them aside; and it is said that the company should mark in the same or some similar way all the cars which do not couple like its own, and then brakemen would be put upon their guard.   As coupling is required to be done at all hours of the day or night at all points on defendant's line, and often under circumstances of great haste, the marking would need to be something the switchman would instantly perceive without groping about for it, and in respect to which there could be no confusion and no mistake.   The best marking might perhaps be a placard of some sort at the end of each

car, where it would readily attract the attention of the coupler; and as there are several different kinds of car, so there would need to be as many different placards. The differences in these would be confusing and likely to lead to mistakes. But we have had produced for our inspection, on the argument, a model of the double dead-woods which caused the injury, and it seems impossible to give to the coupler any better or more effectual notification of their presence, and of the difference from those belonging to the defendants than their very form necessarily gives of itself. The difference is very marked and striking, and it is quite impossible to couple the double dead-woods, or to approach them for the purpose, with any degree of attention, without observing it. This is so whether the coupling is done in the day-time or night-time; for in the night every switchman has his lantern with him, or should have it on all occasions. If therefore a switchman were to declare that he had attempted to couple the double dead-woods without noticing how they differed from the cars of defendant, the conclusion would be inevitable that he had gone heedlessly in the performance of a duty requiring great care, and that he had not allowed his eyes to inform him what was before him.

Moreover the business of the road was of itself a notification that many differences requiring attention in coupling were to be encountered by the switchmen and brakemen. The Michigan Central is a great common way for the cars of all the railroad companies of the country, and every man in the employ of the defendant, if he has ordinary intelligence, is perfectly cognizant of the fact. He knows, too, that the cars of the several railroad and transportation companies differ, and that at one time or another all these differences may appear in the cars he may be called upon to couple or uncouple. Every train is likely to have several kinds, and he cannot assume as he passes from one to another that the two will be alike; much less that the whole train will be. To notify him specially of the differences would not only be troublesome and expensive, and oftentimes, as above explained, confusing, but it would be a work of supererogation;

for any man capable intelligently of performing the duty would be no wiser after the notice than before; and a man who would not heed the information the very nature and course of the business would impart to him, would be protected by no notice.   The best notice is that which a man must of necessity see and which cannot confuse or mislead him; he needs no printed placard to announce a precipice when he stands before it.

It is said the defendant should have reduced the danger to a minimum by furnishing each man with what is known as a "stick" to assist him in coupling.   Our information on this subject is too meager to enable us to determine what force there may be to this position when the facts are fully shown.   We do not know that any implement of the kind is in use by any company, or that the men would be willing to use it and keep it by them ready for use at all times if required to do so.   No jury with the little information on the subject which this record gives could draw an inference of negligence from the failure to adopt this implement.

The primary fact that must rule this controversy is that the Michigan Central Railroad Company is compelled to receive and transport over its road all the varieties of freight cars which are offered to it · for the purpose and which are upon wheels adapted to its gauge.   It is compelled to do so—*First*, because the necessities of commerce demand it. It cannot and would not be tolerated that cars loaded at New York for San Francisco, or at Boston for Chicago, should have their freight transferred from one car to another whenever they passed upon another road.   Time would be lost, expense increased, injuries to freight made more numerous, and no corresponding advantage accrue to any one.   It is compelled to do so, *second*, by its own interest.   To attempt to stop every car offered to it at its own *termini*, that the freight might be transferred to its own vehicles, would be to drive away from its line a large portion of its traffic, and compel it to rely upon a local business for which it must increase its charges to make up if possible for what it would lose.   But *third*, the statute itself requires it.   It is provided

by General Laws 1873, p. 99, that "every corporation own-
ing a road in use shall, at reasonable times and for a reason-
able compensation, draw over the same the merchandise and
cars of any other corporation." The necessities of commerce
require this with such imperative force that there could
scarcely be a more flagrant breach of corporate duty than
would be a refusal to obey this law; and the interference of
the State to punish could hardly fail to be speedy and
effectual.

It does not follow that laborers must sacrifice life or limb
in order to meet this great public necessity. It is certain
that there must be brakemen and switchmen, and that these
must be called upon to perform the somewhat hazardous act
of coupling cars, and of making up trains of cars of different
constructions. But the act is dangerous—*First,* because
inevitable accidents will sometimes occur; and, *second,*
because even in the most exposed positions men will some-
times be wanting in ordinary prudence. But when accident
or negligence intervenes, any business is dangerous; the dif-
ference in danger is only one of degree. There are more
risks in operating a mill by steam than by water, but this
does not prove the use of the steam engine to be negligence
in the mill-owner. The same remark may be made of differ-
ent cars; one construction of car may render necessary a
higher degree of care in coupling than another calls for; but
there is no ground whatever for imputing to this defendant,
or to any other railroad company, legal negligence for that
which was a necessity of its business, and which all persons
in its employ must be presumed to have known was a neces-
sity. *Indianapolis, etc., R. R. Co. v. Flanigan* 77 Ill. 365;
*Toledo, etc., R. R. Co. v. Black* 88 Ill. 112; *Baldwin v. Chi-
cago, etc., R. R. Co.* 50 Iowa 680.

The judgment must be reversed with costs and a new trial
ordered.

The other Justices concurred.