JAMES H. BENSON *vs.* NEW YORK, NEW HAVEN & HARTFORD R. R. Co.

PROVIDENCE—JULY 1, 1901.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1)  *Negligence.  Freight Trains.  Evidence.  Reasonably Safe Appliances.  Master and Servant.*

The legal test of reasonable safety in machinery and methods is ordinary use.  Hence in an action brought by a brakeman against a railroad for injuries received in attempting to step from one car to another on a dark night, while engaged in making up a freight train, the accident happening because of the cutting out of a square piece in the diagonal corners of the car which he attempted to reach—this feature being intentional and a part of the original construction of the car—evidence tending to prove that similar cars were in common use on other roads in New England is competent as bearing upon the question of their reasonable safety.

(2)  *Evidence.  Credibility of Witnesses.*

Where defendant railroad offered uncontradicted testimony that it had from fifty to eighty cars of similar construction to the one which plaintiff claimed was unsafe upon its road prior to the accident, and that such cars were passing through the city where plaintiff was stationed, at varying intervals, some of such witnesses being fellow-employees of plaintiff, and plaintiff denied ever seeing such cars, and some of his witnesses testified to seeing them but seldom, testimony that cars of similar construction were in common use on other roads in New England, liable to be exchanged with defendant's road, was admissible as bearing upon the credibility of the conflicting witnesses.

(3)  *Master and Servant.  Assumed Risks.*

A brakeman in the employ of a railroad company, with ten years experience, who is injured on a dark night while engaged in making up a train because of failing to reach a car toward which he had stepped from the roof of the next car, by reason of a square piece being cut out of the roof in its original construction, assumes the risk of injury from such construction when it is shown that he was acquainted with the great diversity existing in the construction of such cars,

(4) *Evidence.*

Where it was not claimed that the running-board of the car upon which an accident happened, or the running-board or roof of any other car of the train was out of repair, it was error to allow plaintiff to show, as an excuse for his not using the running-board on the occasion of the accident, the lack of repair of running-boards on freight trains in general, in comparison with that of the roofs of freight cars off the running-boards.

TRESPASS ON THE CASE for negligence.    The facts are fully stated in the opinion.    Heard on petition of defendant for new trial, and new trial granted.

ROGERS, J.    This is a petition for a new trial by the defendant in an action on the case for negligence, after a verdict by a jury for the plaintiff for $10,000.    The grounds of the petition are, that the verdict was against the evidence and the weight thereof ; that the presiding justice erred in the admission and rejection of certain evidence ; that he erred also in his instructions to the jury, and in refusing instructions requested by the defendant ; and that the damages awarded were excessive.

(1)    More particularly stated, the principal questions arising in the case relate to the proper standard by which to determine whether the appliances and instrumentalities—in this case a freight car—furnished by an employer to an employee, are reasonably safe and suitable, and the evidence properly admissible to prove it ; also, whether the admission of evidence showing the relative condition of repair of running-boards in comparison with the roofs of freight cars in general off the running-board, as bearing on the question of contributory negligence, is proper.

The plaintiff was a freight brakeman and yardman, and had been in the employ of the defendant for ten years, seven of which he was in the Fall River freight yard, one year nights and the remainder days ; then for a year running on the road on a freight train from Fall River and Brockton up as far as Blackstone, and the remaining two years here in Providence, thirteen months of which was in the India Point yard on night duty.    When he left Fall River and came to Providence, in

1896, he represented himself to be, and was hired as, an experienced brakeman.

The accident in which he was injured, and for which he brought this action, occurred on November 19, 1898, at one o'clock at night, when it was dark and stormy, and when he was occupied in making up a train of freight cars. The method of proceeding was to place the "buggy" or "caboose," which is always the rear car of the train, and then add freight cars until the train was complete. A switching engine and crew fasten to the cars in the order desired, on whatever track they may be, and haul them upon the main track, that being the track on which the train was being made up. After the cars attached to the switcher had passed eastward a little distance over the switch from the side track to the main track, the switcher with the cars stopped, the switch was thrown so that if the cars should be pushed westward over the main track they would run down to the caboose, the pin between the switcher and the freight car next to it was pulled thereby disconnecting the cars from the switcher, so that when the switcher backed it pushed the cars westward far enough to give them the necessary impetus; and though it stopped when they had gotten sufficient speed on, yet, the cars having been disconnected from the engine kept on until they were stopped by the use of a brake as their stopping place was the caboose, care being necessary to reduce the speed so that they would not collide with or bump the caboose too hard.

When the accident happened the switcher had fastened to four box freight cars and hauled them eastward upon the India Point bridge, as the location of the switch necessitated taking the cars upon it to clear the switch. The head brakeman, one Welcome, was on the car next to the switcher, and the plaintiff was the hind brakeman, and was on the next car in the rear, or the next car but one to the switcher, and two other freight cars were in the rear of the car the plaintiff was on. When the rear car going eastward had got sufficiently clear of the switch the plaintiff gave Welcome the signal to pull the pin and disconnect with the engine, which he did as it was his duty to do, getting off the cars to do it, and leaving the

plaintiff alone on the cars.    The plaintiff then gave the engineer the signal to back down, or *kick*, as it is called, which he did, thus causing the four cars to go westward to connect with the caboose.    The plaintiff then started on a kind of trot, to use his own expression, to the west end of the cars as they were proceeding westward, to get the best possible view of the caboose and the diminishing intervening distance, and to use the brake nearest that end so as to discharge his duty most efficiently.    The plaintiff did not use the running-board, as it is called, which is about eighteen or twenty inches wide extending down the middle of the whole length of the car and with which all cars are equipped, but ran along some distance one side of it.    It being a stormy night he had on rubber boots and an ulster overcoat, which had been shortened somewhat, and he also carried a lighted lantern for the double purpose of enabling him to signal as well as to see.    When he reached the end of the car he was on and stepped out with his right foot, expecting to reach the next car, he failed to do so and fell between the cars, being dragged a number of yards and then fell to the ground, resulting in the wheels of the car from which he had stepped running over his leg, necessitating amputation about half way between the ankle and the knee.

The duty owed by the defendant to the plaintiff, the violation of which it is claimed caused the accident, the plaintiff's declaration in its first count alleges to be to furnish and provide freight cars that were safe for use in the night-time by the plaintiff in performing his work and labor as a brakeman, and to keep and maintain the same so safe and suitable for the purpose aforesaid ; and in the second count, to furnish, provide, keep and maintain such freight cars so used and run by the defendant in making up its freight trains for use in the night-time by the plaintiff, in a reasonably safe and proper condition so that the plaintiff would not be exposed to any unusual or unnecessary risk or danger.

There was no dispute as to the construction of the car to which the plaintiff started to step when he fell, and the defendant's furnishing a car so constructed constituted the alleged failure of duty of which the plaintiff complained as caus-

ing the injury. The floor and the roof of that car, being freight box-car No. 11,487, extended beyond the end walls of the car, so that the roof formed a hood, and out of the diagonal corners of the roof, being the left-hand corner as one stood in the middle of the car and looked towards either end, a square piece seemed to have been cut out eighteen and a half inches long measuring lengthwise of the car, and twenty-three and a half inches wide, measuring crosswise of the car. This feature of the car was an intentional one, being a part of the original construction, the hood at each end of the car not extending way across the end, but only to within twenty-three and a half inches of the end, so that using a ladder placed at the end of the car against the end wall one could go up and down to and from the car-top without being interfered with by the hood. The car, therefore, was not defective in the sense that any part was missing or deranged that was intended to be there or that formed a part of the original design.

It is a rule of law, so familiar as hardly to need the citation of authorities, that the duty of the master is to provide for his employees a reasonably safe place in which to work, and reasonably safe appliances and instrumentalities for the performance of the work. *Brodeur* v. *Valley Falls Co.*, 16 R. I. 448, 450; *McGar* v. *Nat. & Prov. Worsted Mills*, 22 R. I. 347, 350.

Of course the suitableness of place and instrumentalities are to be taken in connection with the work to be done and the workmen to do it. The plaintiff was an experienced brakeman, was employed and paid as such, and had been in the defendant's employment for ten years. He was accustomed to work at night in making up trains and he knew that there was a great variety of difference in freight cars, as shown by the record of his testimony, viz.: " C. Q. 635. You have other cars, flat cars, frequently, do you not? Ans. Yes sir. C. Q. 636. You have them right along all the time? Ans. Yes sir. C. Q. 637. Liable to have them in the night just the same? Ans. Yes sir. C. Q. 638. You knew that night these were all box cars? Ans. Yes sir. C. Q. 639. How did you know they were all box cars? Ans. I heard

somebody in the office say, get the four head box cars.  C. Q.
640.  Who did they say it to?  Ans. I cannot say.  C. Q.
641. If you hadn't been in the office at that time you wouldn't
have known if you hadn't heard that there were four box
cars?  Ans. No.  I don't know.  C. Q. 642.  There was no
way—you were not told—you were told to hook on and shove
them out, you were not told as a rule that you were to go
—told that they were a certain kind of cars?  Ans.  Not
always.  C. Q. 643.  You got on at seven that night, and hap-
pened to be in the office and hearing someone say so, other-
wise you wouldn't have known they were all box cars?  Ans.
I wouldn't know whether they were all box cars or not, no.
C. Q. 644.  If you hadn't heard this man in the office say get
out these cars and you hadn't happened to be in the office
you would have got out about the yard and gone to work not
knowing these were all box cars?  Ans. Yes sir.  C. Q. 645.
There might have been some flat cars and you not know it?
Ans.  Not if I hadn't seen them.  C. Q. 646.  You wouldn't
have known from anybody else telling you?  Ans.  No sir.
C. Q. 647.  Frequently in making up this train there's all
kinds of cars, different heights?  Ans.  Different heights,
everything of that kind, flat cars and box cars.  C. Q. 648.
Flat cars and box cars?  Ans. Yes sir."

He also swore that cars varied in height, that box cars
varied in height from eighteen inches to two feet.  They also
varied in length, some being ten or twelve feet longer than
others.  They also differed in construction, in the types of
them, the pitch of the top was different, some of the roofs
were more level than others; but all cars not out of repair
had running-boards along the middle of them, which are flat
on top.  Then on top of cars off the running-board there are
ventilators on fruit cars, stove-pipes on some others, slats and
other things for different purposes, brakes, grab-irons, etc.
The plaintiff also swore that he had seen " buggies " or
" cabooses," with the corners cut away as in the car com-
plained of, but he denied he had ever seen a box freight car
so made.  The tops of box cars, also, were different distances
apart, varying, he swore, from twenty-two to thirty-six

inches.   The plaintiff admitted that the flat running-boards were provided for use by those on top of the cars, though no rule or order by the defendant company had ever required the use of them.

An important, if not indeed the pivotal or most important question on the trial of the case at bar before the jury was whether the defendant corporation had furnished freight cars in a reasonably safe and proper condition for use by the plaintiff in the night-time in making up its freight trains.   The inevitable inference from the jury's verdict for the plaintiff was that the car in question was not in a reasonably safe and proper condition in their opinion under the evidence allowed to be submitted to them, and under the instruction of the court.   The defendant in attempting to prove that cars like the one complained of were in common use on other roads in New England, for the purpose of showing that they were reasonably safe and suitable cars, asked the witness Appleyard, who was the master car-builder of the defendant corporation, this question : "Q. 26. Do you know or not whether they were in common use on other roads in New England ?" Record, p. 294.   This question was objected to by the plaintiff and ruled out by the presiding justice, to which exception was taken, and the inquiry now is whether the ruling was correct.   The answer depends upon what is a proper standard by which to determine negligence in furnishing instrumentalities and appliances, and what kind of testimony is competent as tending to show the exercise of due care.

In *McGar* v. *Nat. & Prov. Worsted Mills, supra,* this court, in passing upon this instruction of the court below, viz. : " The defendant is bound to give its belts and lacings only such inspection as ordinarily careful manufacturing corporations give under like circumstances," speaking through Tillinghast, J., p. 355, said : "We see no objection to the request as presented."

In *Burns* v. *New York, Prov. & Boston R. R. Co.*, 20 R. I. 789, 790, this court used these words : "No testimony was adduced by the plaintiff to show that it is customary for railroad companies, or that it has ever been considered essential

by prudent men engaged in the operation of railroad trains to remove spindles from the draw-bars for the purpose of inspecting them, and in the absence of such testimony, we are of the opinion that it was not negligence for the defendant to omit an inspection of the spindle in question in that manner."

In *Leonard* v. *Herrman*, 195 Penn. St. 222, 224, the court said : " The legal test of reasonable safety in machinery or methods is ordinary use, and a jury cannot be permitted to set up any other."

In *Titus* v. *Bradford, etc., R. R. Co.*, 136 Penn. St. 618, the court used this language : " Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger but of negligence ; and the unbending test of negligence in methods, machinery and appliances is the ordinary uses of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual or ordinary way, commonly adopted by those in the same business, is a negligent way for which liability shall be imposed."

In *Wormell* v. *Railroad Co.*, 79 Me. 397, 404, the court said : " Nor is the employer bound to furnish the safest machinery, instrumentalities or appliances with which to carry on his business, nor to provide the best methods for their operation, in order to save himself from responsibility resulting from their use. If they are of an ordinary character and such as can with reasonable care be used without danger, except such as may be reasonably incident to the business, it is all that the law requires."

In *Cunningham* v. *Iron Works*, 92 Me. 501, 507, the court said : " It was the unquestioned duty of the defendant to exercise ordinary care and foresight to provide safe machinery and a reasonably safe place in and about which the helpers and other laborers were required to work ; but the question

of the fulfillment of this duty must be tested by the experience of employees who are themselves in the exercise of due care and vigilance, and not with reference to those who are themselves either negligent or the unfortunate victims of simple and unaccountable accidents. The fact that a laborer sustains a serious injury in the place of his service has no necessary tendency to prove the machinery unsafe or the place unsuitable. No machinery can be deemed safe for those who are thoughtless and inattentive or reckless and venturesome. Pure accidents will also continue among the inexplicable factors in the problem of life. Again, the fact that the accident might have been avoided by the exercise of extraordinary precautions on the part of the defendant has no necessary tendency to prove that the existing conditions did not meet the requirement of reasonable safety. Absolute safety under all circumstances is not guaranteed to the laborer by the contract of employment. The employer is not an insurer. He is not bound to furnish the safest machinery, nor to provide the best possible methods for its operation, in order to relieve himself from responsibility. He is only required to furnish instrumentalities that are reasonably and ordinarily safe and well adapted to the purpose for which they are designed."

In *Prybilski* v. *Northwestern Coal Ry. Co.*, 98 Wis. 413, 416, the court said: "The duty of the defendant was to furnish a place as safe and free from danger as other persons of ordinary care, prudence and caution, engaged in like business and in like circumstances, ordinarily furnish."

In *Railroad* v. *Henly*, 48 Ohio St. 608, 612, the court said: "It is generally held that a railroad company is not bound to provide the best or most approved appliances but may use such as are reasonably fit for the purpose, or that may be in general use on well managed railroads."

See also *Northern Pac. R. Co.* v. *Blake*, 63 Fed. Rep. 45, 47; *Hewitt* v. *F. & P. M. R. R. Co.*, 67 Mich. 61, 73; *Hunt* v. *Kile*, 98 Fed. Rep. 49, 52; *Hoffman* v. *American Foundry Co.*, 18 Wash. 287, 290; *Bohn* v. *Chicago, &c., Ry. Co.*, 106 Mo. 429, 434; *Lloyd* v. *Hanes*, 126 N. C. 359, 364; *Omaha*

*Bottling Co.* v. *Theiler,* 80 N. W. (Neb.) 821.; 1 Bailey's Personal Injuries relating to Master and Servant, §§ 70, 73, 74.

We are of the opinion from the authorities referred to that testimony tending to show that cars like the one in question were in common use on other roads in New England, was competent and therefore admissible, and that the exclusion of the question now under consideration was erroneous.

(2)    We are also of the opinion that the testimony would have been admissible, for another reason.    The defendant offered testimony which was not contradicted, save inferentially, that the defendant had from fifty to eighty cars of similar construction to the one in question in use on its road at and immediately prior to the accident, and it also introduced considerable testimony that such cars were passing through Providence at varying intervals, some of such witnesses being employees of the defendant at the same time the plaintiff was in its employ, so that if such witnesses are credible it is a question of some importance why the plaintiff did not see some of those cars.    He swore he had never seen or heard of such freight cars, though admitting he had seen cabooses so constructed.    His brother-in-law, Hurley, who also worked for the defendant corporation, practically swore to the same thing, and some other witnesses for the plaintiff swore to seeing them only seldom.    If the cars of that construction were in common use on other roads in New England, the cars of such roads being liable to be exchanged with the defendant's road, the evidence rejected would have a bearing upon the credibility of the conflicting witnesses and would, therefore, be admissible on that ground.

(3)    The defendant requested the presiding justice to charge the jury as follows : "If cars constructed in the manner in which car No. 11,487 was constructed were in common use by well managed railroads, the plaintiff assumed the risk and the verdict must be for the defendant." This request was refused, and in lieu thereof the presiding justice charged as follows: "If cars constructed in the manner in which No. 11,487 was constructed were in common use by well managed

railroads and were received in exchange by the defendant corporation to the knowledge of the plaintiff, or if the plaintiff, with the exercise of reasonable care, might have known of such common use of such cars, the plaintiff assumed the risk of finding one in the train upon which he was acting as brakeman and the danger attending the same, if any, and in such case the verdict must be for the defendant." To that refusal and substitution the defendant duly excepted.

Inasmuch as the defendant's request that was refused, had no limitation as to place, but referred simply to cars in common use on well managed railroads—not in New England, not in the neighborhood of this State or of the location of the defendant's railroad, not even in the United States—we think the request was properly refused in the exact form as requested; but in our opinion the substitution, while localizing the use of the cars in question, was erroneous in that the use was limited "*to the knowledge of the plaintiff.*" The plaintiff was an experienced brakeman and had hired himself as such. He was over thirty years of age and had been ten years in the business. He knew, as we have already seen from his own evidence, that freight cars differed very greatly in construction, there being a great diversity in the heights of them, and in the distance between them when coupled together; the diversity being so great that box cars and flat cars were coupled together, and he admitted that he knew that cabooses had the corners cut out. Certainly the difference between box and flat cars was far greater than that existing between No. 11,487 and some other kinds of cars. He knew that he must look in passing from one car to another and he was provided with a lantern to afford him light, and yet with all this knowledge or means of knowledge he walked into an opening of a foot and a half to two feet square in addition to the distance between the car he was on and the car he was approaching. When the plaintiff was advised by his experience of the great diversity existing in the construction of cars, it seems to us of little importance whether he had seen a freight car of just that make or not, though he admits he knew cabooses were made so. Using

cars of various construction was a risk incident to his employment.

Dunbar, C. J., in *Olson* v. *McMurray C. L. Co.*, 9 Wash. 500, 502, said: "Men who are working around dangerous machinery, must notice. Their faculties and senses are given them for the purpose of self preservation, and they must exercise them to a reasonable extent. . . . The dangers in this instance were apparent, and the law is well settled that an employé when he assumes his employment takes the risk of all apparent danger. This was the doctrine announced by this court in *Week* v. *Fremont Mill Co.*, 3 Wash. 629, and *Jennings* v. *Tacoma Ry. & Motor Co.*, 7 Wash. 275, and is the doctrine of common justice and right between employer and employé, and the doctrine of common sense."

In *Yeaton* v. *Boston & Lowell R. R. Co.*, 135 Mass. 418, C. Allen, J., said: "The general rule of law, that a servant takes upon himself the risk of the dangers which ordinarily attend or are incident to the business in which he voluntarily engages, is well settled and undisputed."

In *Michigan Central R. R. Co.* v. *Smithson*, 45 Mich. 212, a switchman had his hand crushed while coupling a freight car furnished with double dead-woods and received from another road where such a contrivance was generally used. He had not been expressly notified that he would be required to handle such cars, but in the course of commerce and as a matter of business necessity as well as of statutory obligation they were being constantly received and forwarded like all other cars adapted to the gauge of the road, and having occasion to run thereon. It was held that the switchman could not recover. In delivering the opinion Cooley, J., said on p. 220: "But we have had produced for our inspection a model of the double dead-woods which caused the injury, and it seems impossible to give to the coupler any better or more effectual notification of their presence, and of the difference from those belonging to the defendants than their very form necessarily gives of itself. The difference is very marked and striking, and it is quite impossible to couple the dead-

woods, or to approach them for the purpose, with any degree of attention, without observing it.   This is so whether the coupling is done in the day-time or night-time; for in the night every switchman has his lantern with him or should have it on all occasions.   If therefore a switchman were to declare that he had attempted to couple dead-woods without noticing how they differed from the cars of defendant, the conclusion would be inevitable that he had gone heedlessly in the performance of a duty requiring great care, and that he had not allowed his eyes to inform him what was before him.

"Moreover the business of the road was of itself a notification that many differences requiring attention in coupling were to be encountered by the switchmen and brakemen. The Michigan Central is a great common way for the cars of all the railroad companies of the country, and every man in the employ of the defendant, if he has ordinary intelligence, is perfectly cognizant of the fact.   He knows, too, that the cars of the several railroad and transportation companies differ, and that at one time or another all these differences may appear in the cars he may be called upon to couple or uncouple.   Every train is likely to have several kinds, and he cannot assume as he passes from one to another that the two will be alike; much less that the whole train will be. To notify him specially of the difference would not only be troublesome and expensive, and oftentimes, as above explained, confusing, but it would be a work of supererogation; for any man capable intelligently of performing the duty would be no wiser after the notice than before; and a man who would not heed the information the very nature and course of the business would impart to him, would be protected by no notice.   The best notice is that which a man must of necessity see and which cannot confuse or mislead him; he needs no printed placard to announce a precipice when he stands before it."

To the same effect in a similar case see *Hathaway* v. *Michigan Central R. R. Co.*, 51 Mich. 253.

The rule that when a person enters upon dangerous employment he assumes the risk and dangers incident thereto,

is so well settled that it needs no array of authority in its support here. Suffice it to say that it is recognized in this State in *Gaffney* v. *New York & New England R. R. Co.*, 15 R. I. 456, 457; *Brodeur* v. *Valley Falls Co.*, 16 R. I. 448, 452; *Whipple* v. *N. Y., N. H. & H. R. R. Co.*, 19 R. I. 587, 590; etc.

(4)     We are of the opinion that the errors hereinbefore referred to are sufficient to entitle the defendant to a new trial.

The plaintiff was allowed to show, against the objection of the defendant, as a reason, excuse or justification for his not using the running-board on the occasion of the accident, the degree of repair, or rather lack of repair of running-boards on freight cars in general in comparison with that of the roofs of freight cars off the running-board. It was not pretended that the running-board of car No. 11,487 was out of repair, or that the running-board or roof of any other car on that train was out of repair. If the car in question was not out of repair it matters not what the condition of other cars was. We fail to perceive how such a line of examination was competent, and its admission, we are of the opinion, was erroneous.

The defendant's other objections to the admission of evidence were properly overruled in our opinion.

New trial granted and case remitted to the Common Pleas Division for further proceedings.

*J. W. Hogan*, for plaintiff.

*David S. Baker*, for defendant.