HARRISON v. DETROIT, YPSILANTI, ANN ARBOR & JACKSON RAILWAY.

1. MASTER AND SERVANT—ASSUMPTION OF RISK.
   An employé assumes the risk of all such dangers incident to the employment as he knows to exist or should acquaint himself with.

2. SAME — STREET RAILWAYS — ASSUMPTION OF RISK — ELECTRIC SHOCK.
   A motorman, killed by an electric shock due to a trolley pole coming in contact with a high-tension wire while he was removing it from its socket, assumed the risk, where it appeared that, from the length of his employment, he must have known the danger from the high-tension wire, and that the wire was within reach of the trolley pole if removed from the socket, and it was not necessary that the company should instruct

him that electricity would arc if the end of the pole should come within one-half inch of the high-tension wire.

Error to Washtenaw; Kinne, J.   Submitted February 4, 1904.   (Docket No. 82.)   Decided July 7, 1904.

Case by Phila Harrison, administratrix of the estate of Herbert J. Harrison, deceased, against the Detroit, Ypsilanti, Ann Arbor & Jackson Railway for the alleged negligent killing of plaintiff's intestate.   There was judgment for plaintiff, and defendant brings error.   Reversed.

*Corliss, Andrus, Leete & Joslyn,* for appellant.

*A. J. Sawyer & Son,* for appellee.

MONTGOMERY, J.   This action is brought by the plaintiff, as administratrix of the estate of Herbert J. Harrison, deceased, who met his death while employed by the defendant as motorman on its electric car.   The principal question discussed in this court is whether there was evidence tending to show culpable neglect on the part of the defendant, and whether there was contributory negligence on the part of the deceased and his co-employés, and whether the deceased assumed the risk of the conditions of the employment as they existed.   For an understanding of the case a full statement of facts is essential, and we adopt the statement given by the counsel for the defendant, with such slight variations as the record makes essential:

For some years the defendant company operated an electric railway between Ann Arbor and Detroit by what may be termed the "direct trolley current system," and plaintiff's employment began while this current was used.   Later the defendant acquired the necessary right of way from Ann Arbor to the city of Jackson.   In order to operate an electric line for that distance it was at least commercially necessary to install a new system of transmitting

electric power or current along the line, which is known as the "high-tension system."

This system is a method of generating at the power house a large volume or current of electricity, but with a comparatively low voltage, and converting it into a small current or volume with an exceedingly high voltage, and carrying it out along the line on small wires to be taken off at different points called "substations." At these substations the current is reconverted into the large volume again, with a pressure adjusted to the requirements of the trolley wire. The method of transmission of the current may be likened somewhat to transmitting water through pipes. If, for instance, the water passing through a four-inch pipe is to be sent through an inch pipe, the current or pressure in a small pipe must be many times greater than in the large pipe. If the pressure in the small pipe is greater than can be used at the other end, then it can be discharged in a four-inch pipe, when the current or pressure would be brought back to what it is in the four-inch pipe at the other end, less the friction. From the foregoing it will be seen that no more actual power, or even pressure, is used to propel cars than would be used by the direct trolley current. In fact, the same direct trolley current is used as before, but the surplus power carried along the line in a different form and manner until it is necessary to use it on the trolley wire.

The ordinary mode of transmission of high potential currents is by what is called the "multiphase system." Technically, this consists of "the use of two or more alternating currents of equal period, but differing in phase." "Differing in phase" means that the two alternations or current waves do not come together, but one after or at a different time from the other. The three-phase system is used by the defendant. Three wires are strung along in the form of an equilateral triangle, each substation being fed from a set of these wires. Theoretically, in each of these triangular sets of wires, one of them at any given moment of time is dead, but, as it is so only for an infin-

itesimal part of a second, it is for all practical purposes very much alive at all times and dangerous, carrying a voltage of upwards of 22,000.   To establish this system it was necessary to set a new line of poles.   The high-tension wires were carried on two cross-arms, one above the other, the longer one being at the top, carrying four of these small wires, and the lower one carrying two.   These six wires formed two triangles, with one of the points of each downward.

Below these cross-arms on the same pole is an arm long enough to extend a little past the center of the railway track, so as to carry suspended from it two trolley wires 6 inches apart and 18½ feet above the rails.   The northerly trolley wire is used by the cars going west, and the southerly by the cars going east.   From the poles to the center of the track it was 6 feet 4½ inches.   The trolley arm, therefore, would have to be some 3 or 4 inches longer in order to carry the farther trolley wire.   The lowest high-tension wires are between 26 and 27 feet above the rail, and between 4 and 5 feet to the side of the center of the track.   The poles carrying these wires and trolley arms were 35-foot poles as a rule, except in places where, to avoid trees and buildings, it became necessary to carry the high-tension wires higher to avoid contact.   The undisputed testimony is that the 35-foot pole is the standard height for carrying high-tension wires in suburban railway construction.

In August, 1901, the reorganization of the line was begun.   The work of stringing the wires commenced about the middle of November of that year, and was completed about the middle of February following, but a portion of the high-tension system was put in operation January 12, 1902, being something over a month before the entire work was completed.   While the work of setting new poles and stringing the high-tension wires was going on, the defendant also reorganized its power house, and built its substations, and put in the new machinery and appliances for generating and handling the high potential currents as

well as the necessary transformers and converters. The entire work was done by Westinghouse, Church, Kerr & Co., under the supervision of its superintendent, Mr. Charles Riley. It is not believed that there will be any dispute over the matters contained in this preliminary statement, nor that it will be necessary to go further into the details of construction in order to give a correct understanding of the general conditions of the railway at the time of the accident which is the origin of this suit.

Herbert J. Harrison began work for the defendant in September, 1900, first as conductor, then as a motorman, on the Ann Arbor city line, on which he remained for about a year. During nearly all of that period, if not all of it, he lived at Inkster, Wayne county, and most of the time went to Ann Arbor in the morning and returned in the evening, riding both ways over defendant's main line. While thus going back and forth he asked for and obtained permission to ride with the motorman, and received from him instructions in the operation of the large suburban cars. It is a conceded fact that he thus became a competent motorman. It should also be said that Mr. Harrison was a man of good habits and careful in the management of matters put in his charge.

Mr. Harrison began operating suburban cars on the main line from Detroit to Jackson some time after August 7, 1901, which was the time he left the Ann Arbor city line. It may have been immediately afterwards, as there is no evidence of his laying off. This would be about the time the work of laying out the new system began. He thus had an opportunity of daily observing the work of setting the poles and stringing the wires as it progressed. Moreover, the general headquarters of the road are at Ypsilanti. The power house at Ypsilanti was a general rendezvous of the conductors and motormen, where the work of reconstructing the system and the coming installation of the high-tension current was a matter of daily discussion and inquiry by them. Mr. Harrison was very frequently there, and made many inquiries of Mr. Riley,

superintendent of construction, about the new system. He asked how high the voltage was to be, and other similar and most natural questions for one who was to use the current. Under the old system it was usual, if the trolley wire was down on the track, to pass a rope around it to pull it off, or to take a piece of dry board and push it away. Harrison asked Riley if it would be safe to put a rope around a high-tension wire. Riley said, " No; keep away from it." It was a matter of common knowledge among all the employés that the current was dangerous, and that they should use the utmost care to prevent making a contact with the high-tension wires. Harrison himself warned one of the men to be very careful.

The trolley poles in use on defendant's line are 11½ feet long. Each of defendant's cars carries an extra trolley pole lashed to the top of the car, to be used in case the one in use becomes disabled. One of the duties of the men operating the car is to climb on the top of the car to change the trolley pole whenever it becomes necessary, and this is one of the duties about which they are instructed. All the men were well informed of and understood the danger of contact with a high potential current, and were warned to " avoid in every way possible from getting a shock."

On the night of March 11, 1902, at about 9 o'clock in the evening, car No. 6 was coming east from Jackson in charge of Henry W. Pullen, conductor, and Herbert J. Harrison, motorman. About three miles west of Chelsea, the trolley jumped from the wire twice. Then Pullen gave a signal to Harrison to come back and see what was the trouble. He did so, and discovered that the wheel or trolley would not revolve. The night was dark, and it had been raining hard, so it was decided to run to Chelsea before changing the trolley. When they arrived there they climbed upon the car to change poles. The pole which had been in use was allowed to stand nearly upright, and Pullen took hold of it while Harrison loosened the burrs or nuts which held the pole in the socket. It is customary to first loosen the pole, and then both persons lift it out,

and both take hold of the new one and place it in the socket. On this occasion Harrison loosened the burrs until Pullen said he thought it would come out. Harrison said, "Wait a minute," and then straightened up and took hold of the trolley. They both lifted, but could not get it out. Harrison said, "I will have to loosen 'it a little more," and proceeded to'do so. Pullen still had hold of the pole, and was twisting it and lifting, and said again, "It is loose enough now, Herby," and, without waiting for Harrison to help him, he lifted it, and he said, "It gave way all at once; it just shot right up." Then there was a flash, and that was all Pullen could remember of the transaction.

The socket is a part of the revolving stand on the top of the car. It has a very strong spring attachment which will cause the trolley pole to stand upright, or nearly so, when the trolley is taken off the wire. In removing the trolley pole the trolley stand is left so that the pole can swing back lengthwise of the car. When in that position there is no possible way of making the pole swing sidewise while it remains in the socket. While the trolley pole is standing up, it is quite close to the trolley wire. It does not reach as high as the lowest high-tension wire, and it is between 4 and 5 feet to the side of it. It cannot be brought nearer any of the high-tension wires until taken out of the socket. The trolley stand has a ground connection, so that in removing the trolley pole care must be taken not to make contact with the trolley stand and at the same time with the trolley pole after the latter is removed from the socket. If such a contact be made, then if the trolley pole touches either the trolley wire or the high-tension wires a dangerous, and perhaps fatal, shock will be received.

It was the claim of the plaintiff, and the testimony was such as to warrant a finding of fact by the jury, that the trolley pole came in contact with the high-tension wires, and by this means the death of Harrison was caused.

It appears from the measurements which the defendant

presented in the case that, when the trolley stand was re-
volved so that the trolley pole would run at right angles
with the car, the trolley could be raised within 1 foot 6½
inches of the nearest high-tension wire, which was between
4 and 5 feet to the side of the center of the car. The low-
est high-tension wire is between 6 and 7 feet higher than
the trolley wire, which is 5 feet 11 inches above the
running board, which is on top and the highest part of the
car. It was shown that the distance from the trolley to
the nearest high-tension wire is fully as great on the de-
fendant's road as that of any other road in the country.
The overhead construction of the road is fully as good, if
not better, than any other seen by the witness Riley,
who is personally familiar with over 50 electric railways
using the high-tension system. The same witness also
testified that the distance the poles were set from the cen-
ter of the track is the standard set. Another expert, Al-
fred C. Marshall, who is chief engineer of the Rapid Rail-
way System, stated that the 35-foot pole is the approved
standard. There was no proof offered tending to show a
faulty construction of any kind, nor was it claimed that
there is any overhead construction anywhere in the coun-
try where the distance between the high-tension wires and
trolley is greater.

In our view of the case, the question of first importance
is whether the deceased assumed the risk of the conditions
as they existed. The general rule upon the subject of
assumed risk is too well settled in this State to make it nec-
essary to quote from the decided cases at any great length.
The employé is, as matter of law, held to have assumed
the risk of all such dangers incident to the employment as
he knows to exist or should have acquainted himself with.
*Michigan Cent. R. Co.* v. *Smithson*, 45 Mich. 221 (7 N.
W. 791); *Ragon* v. *Railway Co.*, 97 Mich. 265 (56 N.
W. 612, 37 Am. St. Rep. 336); *Balhoff* v. *Railroad Co.*,
106 Mich. 606 (65 N. W. 592); *Bauer* v. *Foundry Co.*,
132 Mich. 537 (94 N. W. 9); *Bradburn* v. *Railway
Co.*, 134 Mich. 575 (96 N. W. 929).

The rule is recognized by plaintiff's counsel, but it is contended that in the present case the plaintiff should not be held to have assumed the risk, for the reason that Harrison was not informed that the high-tension wire came within one foot and six inches of the end of the trolley pole when placed on a direct line from the trolley stand, and that the trolley pole was therefore in danger of coming in contact with the high-tension wire while the attempt was being made to remove the pole; that it was not shown that Harrison was instructed or knew that it was dangerous to remove the trolley pole on the side of the car towards the high-tension wire; that he was not instructed that, if the trolley pole came within one-half inch of the high-tension wire, electricity would arc.

Were instructions of this character essential before it be said that the deceased assumed the risk? He knew of the fact that contact between the trolley pole and the high-tension wire would be exceedingly dangerous. Indeed, contact between the pole and the trolley wire with a pole removed from the socket was dangerous only in less degree. He certainly knew that this wire was near enough to be reached by the trolley pole upon its being removed from the socket. Knowing, as he did, of the high voltage in the conducting wires, it would seem obvious that during the term of his employment he should have noticed that they were near enough to come in contact with this pole if the pole was directed toward them. The occasion for special instruction that this pole of 11½ feet in length would reach that distance in whatever direction it was extended is not manifest. And that the distance from the car to the high-tension wire could be as easily estimated by deceased and his co-employés as by any alter ego of the defendant is equally manifest. This being so, it would be understood by him, as well before any instruction in that regard as after, that if this trolley pole was removed in the manner in which it was on this occasion it was likely to, or at least might, come in contact with this high-tension wire. It is undoubted that, knowing this, he knew

that any such contact was almost sudden death to one in whose hands the trolley pole was at the time.   It seems clear to us, therefore, that the danger was obvious, and that it was one assumed by the deceased.

The suggestion that he did not have knowledge that electricity would arc is of little force.   The testimony shows that electricity arcs when a conductor like the trolley pole in question in this case is brought either in contact with the high-tension wire or within half an inch of it.   If the case were one in which in the performance of the duty of the employé it became necessary for him to bring this conducting trolley pole within half an inch of the high-tension wire in the ordinary discharge of his duty, a different question might be presented.   But the suggestion that he might make nice calculations as to carrying this pole within half an inch of this dangerous current, but would be guilty of negligence himself, or at least held to have assumed the risk, if the pole came in actual contact with the wire, is without force.

Plaintiff's counsel cite us, as sustaining their contention that this was a case for instruction, *Smith* v. *Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542); *Ribich* v. *Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215); *Walker* v. *Railway Co.*, 104 Mich. 606 (62 N. W. 1032).   In the *Smith* and *Ribich Cases* the duty which was neglected by the master was that of notifying the employé of a latent danger which consisted of properties of substances with which he was bound to deal, which might be unknown to an ordinary workman.   In the present case the properties of this high-tension wire were unquestionably known to the deceased. No further instruction was required as to that.   The contention of plaintiff gets down to this: That he should have been told the precise location of this wire with reference to the top of the car, and that the wire could be reached by a pole of the length of the trolley pole.   These facts were open to his observation and to the observation of every employé who passed over this road.   The case of

*Walker* v. *Railway Co.,* supra, was one in which the danger to the injured party arose out of a want of knowledge of conditions which were not obvious.

In the present case we think the danger was obvious and it was assumed, and upon this ground a verdict should have been directed for the defendant. We find it unnecessary to discuss the other questions in the case.

The judgment will be reversed, and new trial ordered.

The other Justices concurred.