### GRAND TRUNK RY. CO. OF CANADA v. MICHIGAN RAILROAD COMMISSION et al.

### DETROIT, G. H. & M. RY. CO. v. SAME.

(District Court, E. D. Michigan, S. D. August 5, 1912.)

Nos. 5,471, 5,476.

1. CARRIERS (§ 11*)—REGULATION—INTRASTATE CAR LOAD FREIGHT—RAILROAD COMMISSION LAW.

Michigan Railroad Commission Act (Pub. Acts 1909, No. 300, as amended by Pub. Acts 1911, No. 139), providing for the regulation of freight traffic within the state, requires railroads doing business in the state to receive and transport at reasonable rates all intrastate car load traffic offered for transportation under the usual conditions locally consigned between points in the same city or town, whether received from another railroad or not, and such as is offered at any junction or transfer point or intersection with another railroad within such city for delivery on team tracks or sidings therein, whether the shipment originated within or without such city or town.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

2. CONSTITUTIONAL LAW (§ 297*)—REGULATION—INTRACITY SERVICE.

Pub. Acts Mich. 1911, No. 139, amending Michigan Railroad Commission Act (Pub. Acts 1909, No. 300), provides (section 7d) that every common carrier operating within the state shall transport at reasonable rates all car load traffic offered for transportation under usual conditions locally consigned between points in the same city or town, and from any junction or transfer point or intersection with another railroad in such city or town, to team tracks or other sidings on any line operated by the delivering carrier, and shall deliver such car or cars on such team tracks or sidings where the car or cars are received from the connecting carrier when required to do so, etc. Held, that the service so required in a city

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

198 F.—64

having a large number of industries and served by a number of railroads with many team, "hold," and industrial sidings used for the delivery of freight is not necessarily a mere switching service, that whether it is transportation is in a given case a question of fact, that a service does not cease to be transportation merely because the movement begins and ends within a city, or is only between an intracity junction or team track or side track, and hence such legislative requirement as to a carrier not incorporated particularly therefor was not objectionable as a deprivation of its property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. § 297.*]

3. CARRIERS (§ 10*) — REGULATION — RAILROAD COMMISSION — QUALITY AND REASONABLENESS OF SERVICE—COMPENSATION.

Under Michigan Railroad Commission Act (Pub. Acts 1909, No. 300, as amended by Pub. Acts 1911, No. 139), regulating intrastate transportation, questions relating to quality and reasonableness of service and compensation therefor are primarily for the consideration of the Railroad Commission, subject to the statutory right of review conferred by the act on the state courts.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 14–20; Dec. Dig. § 10.*]

4. CARRIERS (§ 18*) — REGULATION — TERMINAL FACILITIES — INTRACITY EXCHANGE OF FREIGHT.

An injunction would not be granted to restrain the enforcement of an order of the Michigan Railroad Commission to carry out Pub. Acts 1911, No. 139, requiring carriers operating within the state to receive and transport at reasonable rates car load traffic between points in the same city or town, or from a junction or transfer point or intersection with another railroad, to team or other sidings of any line, on the ground that service would entail large expense and require the acquisition of additional lands for additional terminal facilities, and would also result in congestion of traffic, the latter objection being supported only by ex parte affidavits.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

5. COMMERCE (§ 58*)—REGULATION OF LOCAL COMMERCE—INTERFERENCE WITH INTERSTATE COMMERCE.

A state Railroad Commission's order intended to enforce a state statute (Pub. Acts Mich. 1911, No. 139), requiring intracity transportation of car load freight between junction, intersection, and transfer points, and delivery sidings, could not necessarily and immediately affect interstate commerce as a matter of law, and was therefore not objectionable as a violation of the commerce clause of the federal Constitution, in that its enforcement would result in congesting the carrier's terminal facilities to the detriment of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

6. STATUTES (§ 64*)—PARTIAL INVALIDITY—PENALTY CLAUSE.

Where severe penalties were provided for violation of a statute in a section separate from the substantive part of the act, the balance of the act will not be held unconstitutional in a suit to restrain the enforcement thereof, in which no attempt is made to recover or enforce the penalty provision, on the ground that the penalties are so severe as to be invalid.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. § 64.*]

7. CARRIERS (§ 2*)—REGULATION—STATUTES.

Michigan Railroad Commission Act (Pub. Acts 1909, No. 300) § 7a, declaring that nothing in the act shall require any railroad to give the use

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

of its tracks or terminal facilities to another railroad engaged in like business, and Pub. Acts 1911, No. 139, adding to section 7, subd. d, requiring railroads to transport car load freight consigned locally between points in the same city or town from a junction or transfer point or intersection with another railroad, to team tracks or other sidings of any line operated by the delivering carrier, etc., were consistent with each other, so that the latter subdivision was not in conflict with the former, as requiring a carrier to submit its terminal facilities to the use of another railroad.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. § 2.*]

8. INJUNCTION (§ 22*)—EFFECT.

Injunction would not be granted to restrain the enforcement of certain orders of the state Railroad Commission where the action commanded by the orders had already been taken and suspended by order of the Commission.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 20, 21; Dec. Dig. § 22.*]

· In Equity. Suits by the Grand Trunk Railway Company of Canada and by the Detroit, Grand Haven & Milwaukee Railway Company against the Michigan Railroad Commission and others. On application for interlocutory injunction. Denied.

G. W. Kretzinger and G. W. Kretzinger, Jr., both of Chicago, Ill., and L. C. Stanley, of Detroit, Mich., for complainants.

Franz C. Kuhn, Atty. Gen., of Mt. Clemens, Mich., and George S. Law, and Edward Waer, for defendants.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

PER CURIAM. The Grand Trunk Railway Company of Canada and the Detroit, Grand Haven & Milwaukee Railway Company filed each its separate bill to restrain the Michigan Railroad Commission and the Attorney General of that state from enforcing certain orders of the Commission made under the authority of the Michigan Railroad Commission Act (being Act No. 300 of the Public Acts of Michigan of 1909, as amended by Act No. 139, P. A. Mich. 1911), relating to the intracity transportation of car load freight between complainants' terminal tracks and their junctions with other roads, and to restrain the enforcement of any penalties or remedies provided for the violation of the orders of the Commission or of the acts of the state of Michigan in question. Applications for interlocutory injunctions were heard under section 266 of the New Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]).

Complainants contend that the statute and orders of the Commission in question are unconstitutional and void, first, as denying the equal protection of the laws, in violation of the fourteenth amendment to the federal Constitution; and, second, as contravening the commerce clause of that Constitution. These objections present the larger questions in the case. Other objections, addressed to the validity of the statute and of the proceedings involved, will be stated later. The purpose of the Commission Act, as indicated by its title, is "to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

define and regulate common carriers and the receiving, transportation and delivery of persons and property, prevent the imposition of unreasonable rates, prevent unjust discrimination, insure adequate service, create the Michigan Railroad Commission, define the duties and powers thereof, and to prescribe penalties for violation thereof." The term "railroad," as used in the act, is declared to include all railroads, whether operated by steam, electric or other motive power, except logging or other private railroads not doing business as common carriers, and street and electric railroads engaged solely in the transportation of passengers within the limits of cities or within a distance of 5 miles of the boundaries thereof. The provisions of the act are made applicable "to the transportation of passengers and property between points within this state, and to the receiving, switching, delivering, storing and handling of such property, and to all charges connected therewith, including icing and mileage charges."

By section 7 of the original act, the railroads subject to its provisions are required to "afford all reasonable and proper facilities by the establishment of switch connections between one another and the establishment of depots and otherwise for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith," and to "transfer and deliver without unreasonable delay or discrimination any freight or cars or passengers destined to any point on its own line or on any connecting line" without discrimination in rates and charges between such connecting lines.

Any person delivering property for transportation is given the right of routing shipments, and of prescribing over what connecting line transportation shall be made; and it is declared to be the duty of the initial carrier to observe the direction of such shipper, and, in case such direction is not given, "to so route the freight as to give the property the benefit of the lowest rate published between points of origin and destination." By the same section the Commission is empowered, upon application, to require steam railroads and interurban and suburban railways to interchange cars, car load shipments, less than car load shipments, and passenger traffic "where it is practicable and the same may be accomplished without endangering equipment, tracks or appliances of either party," and to require the construction of physical connections upon such terms as the Commission may determine. The same section provides that:

"Every corporation owning a railroad in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation or individual having connecting tracks; Provided, such cars are of the proper gauge, are in good running order and equipped as required by law and otherwise safe for transportation and properly loaded."

With the further proviso that:

"If the corporations cannot agree upon the times at which the cars shall be drawn, or the compensation to be paid, the said Commission shall, upon petition of either party and notice to the other, after hearing the parties interested, determine the rate of compensation and fix such other periods, having reference to the interests of the corporation or corporations and the public to be accommodated thereby."

The award of the Commission is declared to be "binding upon the respective corporations interested therein until the same shall have been revised."

By sections 22 and following, provision is made for hearing by the Commission of complaints of unreasonable or unjustly discriminatory rates (joint or otherwise), regulations, or practices, and for the fixing of maximum rates, and for setting aside unreasonable or discriminatory regulations, practices, and services, and the substitution of proper action in lieu thereof.

By sections 26 and following, provision is made for action in chancery against the Commission by any common carrier or other party in interest who may be dissatisfied with any order of the Commission of the nature of that above referred to, and the court is empowered "to affirm, vacate or set aside the order of the Commission in whole or in part, and to make such further order or decree as the courts shall decide to be in accordance with the facts and the law." Either party is given the right of appeal to the Supreme Court of the state; and in all actions under this provision the burden is upon the complainant "to show by clear and satisfactory evidence that the order of the Commission complained of is unlawful or unreasonable, as the case may be."

By the amendment of 1911 a new subdivision was added to section 7, as follows:

"(d) Every common carrier operating within this state shall receive and transport at reasonable rates any and all car load traffic offered for transportation under the usual conditions locally consigned between points in the same city or town and shall receive and transport at reasonable rates from any junction point or transfer point or intersection with another railroad in such city or town any and all such car load freight destined to team tracks or other sidings on any line operated by the delivering carrier, and shall deliver such car or cars upon such team tracks or sidings in the city or town where such car or cars are received from such connecting line when required so to do: Provided, that when delivery is requested which will involve the use of a private siding not owned or controlled by consignee, said consignee shall file with both receiving and delivering carriers written permission signed by the owner or lessee of such private siding authorizing the use of same. When the particular delivery desired cannot be accomplished owing to the congestion of cars upon such siding or team tracks, it shall be the duty of the delivering carrier to notify consignee of such conditions and it shall be the duty of such consignee upon receipt of such notice to advise upon what other siding delivery will be accepted or whether or not it is desired that such car or cars shall be held awaiting the opportunity for delivery upon the siding originally designated as the destination."

After the taking effect of the amendment of 1911, and on July 29th, the Grand Trunk Railway System filed its tariff (effective September 1, 1911) covering so-called switching charges within the switching or corporate limits of the city of Detroit, prescribing a charge of $5 per car for switching car load traffic from one to another industry having private sidings, or from one "hold" or team track to another "hold" or team track of the Grand Trunk Railway System, and imposing an additional charge of $3 per car in case of team track deliveries for the unloading of shipments received from or loading of shipments delivered to other carriers. Upon

complaint of a shipper made against "the Grand Trunk Western Railway Company," the Commission, after hearing, held that the charging of a greater rate for the movement of a car load shipment from a junction point with a connecting road to a team track on the Grand Trunk Western road than as charged for a like shipment from an industry to a team track upon the same line is an undue and unjust discrimination; and the railway company was ordered to make and file a tariff removing such discrimination, and making "like charges for the movement of a car load shipment when received from an industry within the city of Detroit upon the said Grand Trunk Western Railway, consigned for delivery upon team track or other siding of said road within the same city, and for a like shipment received by said Grand Trunk Western Railway from a connecting carrier at a junction point within the corporate limits of the city of Detroit, consigned to team track or other siding upon said road within the same city."

The Grand Trunk System thereupon published a new tariff, removing the discrimination by raising to $8 the charge for movement of cars between team tracks and between industrial tracks and team tracks located on the Grand Trunk lines. Upon further complaint that the new tariff was unreasonable and exorbitant, the Commission on March 15, 1912, ordered the postponement of the effective date of the new tariff until April 29th to give the Commission opportunity to investigate the reasonableness of the proposed rate. Thereupon the Grand Trunk System issued a supplement to its tariff suspending the intrastate rates named in the tariff last referred to, and on March 30th published its new tariff, canceling all rates between industries having private sidings on the Grand Trunk System and hold or team tracks on that system, and all rates between junction points with other carriers within the corporate limits of Detroit. The Grand Trunk team tracks were thereby withdrawn from all intracity, intrastate, and interstate switching movements, except as to the Detroit & Toledo Shore Line, with which it was under contract for terminal switching. On April 10th the Commission suspended the last-named tariff supplement until May 25, 1912, to give the Commission opportunity to investigate its reasonableness. On April 12th, two days after the making of the Commission's order suspending the tariff of the Grand Trunk System canceling team track switching, the Grand Trunk Railway of Canada filed its bill in this cause, and on April 27th filed an amended bill. On the latter date the Detroit, Grand Haven & Milwaukee Railway Company filed its bill. A temporary restraining order was made in each case, and is still in force.

[1] Complainants and defendants seem to agree that the statutes in question should be interpreted as requiring complainants to receive and transport, at reasonable rates, all intrastate car load traffic offered for transportation under the usual conditions and falling within either one of two classes: First, such as is locally consigned between points in the same city or town, whether or

not the same is received from another railroad; second, such as is offered at any junction or transfer point or intersection with another railroad within the city for delivery upon team tracks or sidings therein, whether or not the shipment originated within such city or town. Defendants' brief discusses the case with reference only to such two classes. It is not entirely clear whether complainants regard as included a third class, viz., such as is offered upon team tracks or sidings within a city for delivery to a junction or transfer point or intersection with another railroad therein, whether or not the ultimate destination of such shipment is beyond such city or town. We thus find it necessary to discuss the case with reference only to the first two classes of transportation.

[2] 1. The taking of complainants' property without due process is said to result because, as contended, the required services are merely switching services, as distinguished from transportation services. It is contended that intracity switching is beyond any obligation of complainants, and cannot be imposed by the Legislature, and that a carrier not incorporated particularly for such services cannot be required to allow another carrier the use of its terminals to do switching.

An imperative obligation resting upon railroads doing business within this state, not only to furnish equal facilities for the transportation of passengers and freight to all railroads connecting therewith, but to make such track connections with connecting railroads as to permit the transfer from one to the other of loaded and unloaded cars designed for transportation upon both roads, has been too long imposed by statute and declared by the decisions of the courts to now permit of question. Such has been the settled policy of the state of Michigan for more than 30 years. By the amendment of 1879 (P. A. Mich. 1879, No. 207) to the General Railroad Act of 1873 (Pub. Acts 1873, No. 198), express provision was made for compelling such union and connection of tracks under order of the Commissioner of Railroads. The Railroad Commission Act of 1873 (P. A. Mich. 1873, No. 79) contained the provision above quoted in this opinion as contained in the act of 1909, requiring railroads at reasonable times, and for reasonable compensation, to draw over their tracks the merchandise and cars of any other corporation or individual having connecting tracks, with substantially the same provision for determination by the Commissioner of Railroads of the rate of compensation and the stated periods at which cars shall be so drawn, in case the respective railroads cannot agree thereon. Similar statutory provisions have existed ever since 1873.

In the year 1881, in a case in which a switchman sought to recover from a railroad company for injuries suffered in coupling freight cars received from another railroad, the Supreme Court of Michigan, speaking through Justice Cooley, said:

"The primary fact that must rule this controversy is that the Michigan Central Railroad Company is compelled to receive and transport over its

road all the varieties of freight cars which are offered to it for the purpose and which are upon wheels adapted to its gauge. It is compelled to do so, first; * * * but, third, the statute requires it. It is provided by General Laws 1873, p. 99, that 'every corporation owning a road in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation.' The necessities of commerce require this with such imperative force that there could scarcely be a more flagrant breach of corporate duty than would be a refusal to obey this law; and the interference of the state to punish could hardly fail to be speedy and effectual." Michigan Central R. R. Co. v. Smithson, 45 Mich. 212, 221, 7 N. W. 791, 795.

In Michigan Railroad Commission v. Michigan Central R. R. Co. (1911) 168 Mich. 230, 132 N. W. 1068, the Supreme Court of Michigan held valid and enforceable a provision of the Michigan Railroad Commission Act of 1907 similar to that contained in the 1909 act before the amendment of 1911, empowering the Railroad Commission to require railroads to interchange cars, freight and passenger traffic, and to require track connection upon such terms as it may determine, and sustained the order of the Commission requiring such connection and interchange of traffic between a steam railroad and an electric interurban road. That requirements of track connections and interchange of traffic between railroads, imposed by the Michigan statutes previous to 1911, do not amount to the taking of property without due process, needs no extended reference to authority. Michigan Railroad Commission v. Mich. Central R. R. Co., supra; Wisconsin, etc., Ry. Co. v. Jacobson, 179 U. S. 287, 21 Sup. Ct. 115, 45 L. Ed. 194; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 263, 22 Sup. Ct. 900, 46 L. Ed. 1151. If, therefore, the requirement of the services here in question offends against the due process clause of the Constitution, it must be because such required services are not in a proper sense transportation, but are essentially distinguishable therefrom.

The nature and classification of this service may best be appreciated by considering the conditions to which it is sought to apply the orders of the Commission here in question. Detroit is a city of about 500,000 population. It has a large number of industries, and is served by a large number of railroads. For the purpose of facilitating the loading and unloading of freight, each of these railroads has established a greater or less number of team or "hold" tracks, and many of these industries are provided with sidings. These "hold" tracks, team tracks, and industrial sidings are within what are called the switching limits of Detroit. It is stated in defendants' brief, and without contradiction, that the so-called switching district of Detroit extends for a distance of about 22 miles. Such tracks are necessary to prevent the congestion which would result from requiring all car load freight, both in and out, to be delivered at the freight depots of the respective roads, and in a very proper sense are shipping stations. In Railroad Commission v. St. L., I. M. & S. Ry. Co., 24 Interst. Com. Com'n R., at page 294, it was said of team tracks:

"They are analogous to freight depots in that they bear the same relation to car load freight that such depots bear to less than car load freight."

By section 6 of the Railroad Commission Act of 1909 switching connections with private side tracks are required.  By section 13a the requirement is made of suitable freight depots, buildings, switches, and side tracks; and the Commission is empowered to make such orders requiring the same, including "other track accommodations," as it is deemed for the public interest and as shall be just and reasonable.

Setting to one side the question of the requirement of interchange of traffic between connecting roads, the statute, in our opinion, validly empowers the Commission to require local transportation by a railroad between its own shipping stations within a city, whether such plurality of shipping stations has been voluntarily established by the railroad, as here, or has been required by the Commission under its lawful powers, and provided such transportation is for such substantial distance and of such a character as reasonably to require a railroad haul, as distinguished from other means of carriage.  It is also clear that a statute validly may, and that the statutes we are considering do, authorize the employment of such depots, side tracks, and team tracks of a railroad for transporting car load freight to or from the junction of such road with another road as a substantial part of a continuous transportation routing, where such junction is outside the city limits.  Does the fact that such junction is within the city limits necessarily differentiate the two classes of service so as to make the one a transportation within the meaning of the law and the other a mere switching service?  And this in view of the fact that the distances between the city depots and tracks of a railroad and its intracity junction with another road may be as great as between such city depots and tracks and junctions outside the city, or as great as the average distance between extracity freight stations in a fairly populous section.  Or does the fact that such freight movement begins and ends within the limits of a city necessarily characterize its movement between junction point and the station of receipt or delivery as a switching transaction rather than as part of an actual transportation between two termini; that is to say, between the place where the movement begins and the place where the movement ends?  Upon principle, there seems no necessary distinction with respect to either of the two cases suggested.  In either case the shipper is not necessarily doing more than exercising the right of routing shipments between point of shipment and point of delivery.  The cases relied upon by complainants are not in our judgment decisive of the question here presented.  In Stockyards Co. v. Louisville & Nashville Ry. Co., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565, it was held that neither the Interstate Commerce Act of 1887 nor the provisions of the Kentucky Constitution which required railroad companies to receive, deliver, transfer, and transport freight from and to any point where there is a physical connection between the tracks imposed an obligation upon a railroad having its own city stockyards, under a lease from a stockyards company, to accept live stock from other states for delivery

at the stockyards of another railroad in the same neighborhood, although there is a physical connection between the two roads. That case differs from the one before us in these respects: There was in that case no statute in terms requiring the transfer in question. The constitutional provision was construed as referring to a case where the freight was destined to some further point by transportation over a connecting line. The statute before us permits no such construction. It is true that in the stockyards case it was said of the constitutional provision referred to that:

"It cannot be intended to sanction a snatching of the freight from the transporting company at the moment and for the purpose of delivery. It seems to us that this would be so unreasonable an interpretation of the section that we do not find it necessary to consider whether under any interpretation it can be sustained."

But the basis of the decision seems to be that there was neither requirement of public law nor of private contract that the railroad company should deliver its own cars to another road, and that delivery would accordingly have to be made either by unloading or by the surrender of the defendant's cars, and that the courts have no authority to dictate a contract to the defendant or to require it to make one. This objection again does not pertain to the case before us. The case was treated "as an ordinary case of stations at substantially the same point of delivery, and, therefore, as one to be dealt with as if they were side by side." The court, moreover, said:

"It may be that a case could be imagined in which carriage to another station in the same city by another road fairly might be regarded as bona fide further transportation over a connecting road and within the requirements of the Kentucky Constitution."

In Louisville & Nashville Ry. Co. v. West Coast, etc., Co., 198 U. S. 483, 25 Sup. Ct. 745, 49 L. Ed. 1135, it was held that a common carrier may agree with such other carrier as it may choose to forward beyond its own line goods it has transported to its terminus; and, if it has adequate terminal facilities at a seaport sufficient for all freight destined for that place, it is not obliged to allow other and competing carriers to load and discharge at a wharf owned by it and erected for facilitating the transportation of through freight to points beyond that place. This case differs from the instant case in these respects: It involved a wharf which was held in a proper sense to be private, and it was said that the defendant "never became a common carrier, as to this wharf, in the sense that it was bound to accord to the public or to plaintiff a right to use it upon payment of compensation." It was further said that the wharf was "not in strictness the terminus of defendant for unloading its goods." The objection urged in that case that the commerce of the country would be cramped, if not damaged, by the uncertainty of finding quarters for the prompt loading and unloading of vessels, is guarded against in the Michigan statute by the provision authorizing the Commission to determine the rate of compensation and to fix the periods at which cars should be drawn,

and by the provision contained in the proviso of section 7d for guarding against congestion.

The case of Louisville & Nashville Ry. Co. v. Stockyards Co., 212 U. S. 132, 29 Sup. Ct. 246, 53 L. Ed. 441, was similar to the case referred to as reported in 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565. In the case reported in the 212th United States the same condition existed as in the case earlier referred to, in that there was no statute providing machinery for carrying out the provisions of the Kentucky Constitution; and it was held that, in order to deliver as demanded, the railway "would have been compelled either to build chutes or to hand over its cars to the Southern Railway," and that, in the absence of statute or contract, there was no power to compel such action. The court again expressly refrained from saying that a valid law could not be passed requiring the delivery by a railroad of its cars to another railroad. The attempt was made in that case to compel the use of the railway terminals "upon simply paying for the service of carriage," a condition which does not exist here. The action was also construed as an attempt to compel the railroad to deliver cars elsewhere than at its own terminals, while in the case before us delivery is attempted to be enforced only at places which the railroad company holds are parts of its terminal facilities. All three of the cases referred to arose previous to the 1906 amendment of the Interstate Commerce Act providing for compulsory through routing and rating.

In Railroad Commission v. St. L., I. M. & S. Ry. Co., supra, it was held by the Interstate Commerce Commission that a railroad was not required to switch a car containing an interstate shipment of coal from another line connection in the city of its delivery to its own team track for unloading by the consignee, there having been no tariff charge provided therefor; but that such switching could be required between connections with other lines and industries located on defendant's tracks, as to which last service a tariff charge was provided. In the opinion it is said (page 295):

"Switching to an industrial track is a service for which a regular tariff charge is frequently made by carriers and is over tracks and spurs as to which the cost of construction is generally borne in part by owners of the plants to which they extend. Team track delivery is a service rendered by carriers in receiving and delivering car load freight in connection with their own line business and is over tracks owned by the carriers. It is a service for which no separate tariff charge is provided, and which is analogous to freight depot service for less than car load freight. A freight depot owned and maintained by a carrier is a terminal facility for use in handling business from its own line and cannot, under section 3 of the statute, be used for handling business from other lines without its consent."

It will be noted that this decision is based upon two propositions: First, that the statute does not provide for the service; and, second, that no separate tariff charge is provided. The first ground assigned does not apply in the instant case, because the statute expressly requires it. We see no reason why the Commission cannot, under the Michigan statute, require a tariff charge for

such service in connection with, and as part of, transportation by way of through routing.

We find nothing in the propositions decided in United States v. Terminal Railroad Association, 224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810, or in State v. Terminal Railroad Association, 182 Mo. 284, 81 S. W. 395, opposed to the validity of the legislation we are considering. The case of Chicago, I. & L. Ry. Co. v. Railroad Commission (Ind.) 95 N. E. 364, decided by the Supreme Court of Indiana, sustaining a statute in many respects similar to that before us, is well in point upon the question of due process, as well as upon certain of the other questions here involved.

The section of the Michigan statute here involved relates by its terms to transportation, and the defendants seek to sustain the validity of the statute with respect to the services in question upon the sole ground that they do in fact constitute transportation. While we do not say that there may not be cases distinctively of switching or team track delivery which do not amount to transportation, in our opinion, a service calling for the use of the so-called terminal facilities of a connecting railroad does not lose what would otherwise be the quality of transportation from the mere facts either that the movement begins and ends within the switching or corporate limits of a city, or that the transportation is only between an intracity junction and team track or side track. Whether a given service is delivery as incidental to and as a part of a transportation in which the delivering carrier has substantially participated, or is a delivery incidental only to a "transportation" which has been wholly performed by another carrier, is, at the last, a question of fact, to be determined in the given case as it may arise.

The conclusion we reach is that the imposing upon complainants of the duty of transportation prescribed by the statute, as we have interpreted it, is not sufficient to constitute a taking of complainants' property without due process of law.

[3] Questions relating to quality and reasonableness of service, and compensation therefor, are primarily addressed to the Commission, subject to the statutory authority of revision conferred by the act upon the state courts. No case of threatened abuse of its powers on the part of the Commission is presented.

[4] But it is urged, and the ex parte affidavits of complainants' representatives tend to show, that the performance of the class of services in question would tend to congest complainants' presently existing terminals, and thus interfere with the proper handling of the traffic; that during the period in which such services were furnished more or less congestion did result; that sufficient vacant land cannot be acquired for the necessary enlargement of such terminals; and that to acquire lands now occupied would cost several hundred thousand dollars. So far as concerns the expense of enlarging and extending complainants' track facilities, it would seem that, if complainants could otherwise lawfully be required to provide the service in question, such obligation could not be avoid-

ed because attended with considerable expense. As respects temporary congestion pending such extension of facilities, we would not be warranted, upon ex parte affidavits, in enjoining the enforcement of the statute, especially in view of the powers given the Commission toward preventing congestion, and in view of the fact that the service seems not to have been discontinued by reason of such congestion, but immediately because of the controversy over rates.

[5] 2. The alleged violation of the commerce clause of the federal Constitution rests upon the argument that the enforcement of the statute and the orders referred to will necessarily result in congesting the terminal facilities of complainants, and thus make it impossible for them to carry on interstate business without seriously delaying and interfering with such commerce. The statute does not embrace interstate commerce. It is confined to intrastate business. It has been so construed by the Supreme Court of Michigan. Mich. Central R. R. Co. v. Michigan Railroad Commission, supra. The statute cannot be said to interfere with interstate commerce unless such is its direct, immediate, and necessary effect. Louisville & Nashville R. R. Co. v. Kentucky, 161 U. S. 677, 701, 16 Sup. Ct. 714, 40 L. Ed. 849; Louisville & Nashville R. R. Co. v. Kentucky, 183 U. S. 503, 518, 22 Sup. Ct. 95, 46 L. Ed. 298. It is not, and cannot be, claimed that such effect results as matter of law; that is to say, it can only result because and when it is established by proofs that such is in fact the direct and necessary result of the enforcement of the act and the orders of the Commission. What has already been said respecting the congestion of complainants' existing terminals, in considering the question of due process, is equally pertinent to the objection of interference with interstate commerce.

[6] 3. The statute is assailed as unconstitutional on its face, as denying the equal protection of the law because imposing, as alleged, such severe penalties for disobedience of its provisions as to deter parties affected thereby from testing its validity in the courts. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, is relied upon to support this contention. But, without regard to the question whether the penalties provided by this statute are so excessive as to be void, it is sufficient to say that we have not before us an action for the recovery of penalties, that the penalties are embraced in a section by themselves, and thus plainly separable from the provisions here involved; and the question of the constitutionality of the penalty clause may properly be left to be determined should an effort be made to enforce the same. Wilcox v. Consolidated Gas Co., 212 U. S. 19, 53–54, 29 Sup. Ct. 192, 53 L. Ed. 382; United States v. Delaware & Hudson Co., 213 U. S. 366, 417, 29 Sup. Ct. 527, 53 L. Ed. 836; Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 443, 30 Sup. Ct. 535, 54 L. Ed. 826.

[7] 4. Subdivision "a" of section 7 of the statute declares that:

"Nothing in this act shall be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in like business."

It is urged that to require a carrier to receive or transport over its tracks the merchandise and cars of any other corporation or individual having connecting tracks is to require it to give the use of its tracks and terminal facilities to another railroad engaged in like business, and that the act is thus so inconsistent and uncertain as to be utterly null and void. We think the two provisions in question can be so construed as to give effect to both.

The provision in subdivision "a" above referred to was contained in the Act of 1907, construed by the Supreme Court in Michigan Central R. R. Co. v. Michigan Railroad Commission, supra, in which case (although the provision in question in subdivision "a" was not referred to in the opinion) the court upheld the provision requiring interchange of traffic and track connections, including the transporting of cars from another railroad. Moreover, subdivision "d" was enacted by way of amendment subsequent to the original adoption of subdivision "a." If either provision were required to give way, it would seem that the later would prevail.

5. The orders entered by the Commission are denounced as void because made in proceedings to which complainants were not parties. Neither complainant is made a party to the proceedings in which the orders of February 6th and March 15th were made; the only respondent being the "Grand Trunk Western Railway Company."

[8] But complainants need no injunction to restrain the enforcement of those orders. Such attempted enforcement could not harm them, for the action commanded by the order of February 6th has already been taken, and the tariff suspended by the order of March 15th has been canceled. It is, moreover, alleged in defendants' brief, and not denied, that both these orders were suspended by an order of the Commission of May 14th. The order of April 10th, which suspended until May 25th the tariff of April 11th (which canceled team track switching and left in effect no rates therefor), seems to have been made in the original proceeding to which neither complainants were formally made parties. All the tariffs in question were made by "Grand Trunk Railway System," to which system both complainants belong, and which system the bills allege may and does lawfully issue tariffs for the entire system, without the necessity of further action by the separate companies. The Grand Trunk Western Railway belongs to the Grand Trunk Railway System, but has no tracks in Detroit. The bills allege that in the proceedings mentioned the Grand Trunk Western Railway Company was impleaded as "Grand Trunk Railway Company." Whether under the facts stated complainants would be affected by orders in proceedings to which they were not separately made par-

ties, and by name, we need not inquire, for we gather from the allegations of the bills that the Commission is not threatening to enforce its subsisting order of April 10th without making complainants parties to the proceedings in question; the allegation being that the Commission "gives out and threatens that it will make orator a party to said proceedings brought by said John S. Haggerty, and to said order entered therein (referring to order of April 10th), and to all proceedings under said suspension of said last-named tariff," and that it will require complainants to continue local switching business and to allow the use of its terminals for the purposes hereinbefore stated. Moreover, the order of April 10th simply postponed the tariff canceling team track switching to give the Commission an opportunity to investigate its reasonableness, and it does not appear that such further investigation has been had. In spite, therefore, of later allegations of threatened injurious action, we would not be justified in assuming that the Commission would attempt to or could do anything to complainants' injury under the order of April 10th without further impleading, investigation, and hearing.

It follows from what has been said that the application for interlocutory injunction should be denied, and the existing restraining order vacated. As the questions presented are important and review may be desired, the formal entry of the orders in accordance with this opinion will be withheld until September 5th next, to give complainants opportunity to present such applications as they may desire for a continuance of the restraining order pending appeal (under the rule stated in Hovey v. McDonald, 109 U. S. 150, 161, 3 Sup. Ct. 136, 27 L. Ed. 888, and Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 80, 22 Sup. Ct. 30, 46 L. Ed. 92) in case such appeal is to be taken.